# THE AMERICAN COAL COMPANY

## *vs.*

# THE COUNTY COMMISSIONERS OF ALLEGANY COUNTY.

*Police power of State : mining operations; regulation of—.
Compulsory insurance.*

The police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State. p. 572

Neither the Declaration of Rights nor the Fourteenth Amendment to the Constitution of the United States were intended to restrain the reasonable exercise of the police power by the States. p. 573

The provisions of Chapter 153 of the Acts of 1910, as amended by Chapter 445 of the Acts of 1912, providing for a "Miners' and Operators' Co-operative Relief Fund," for the relief of employees injured in coal and clay mining in Allegany and Garrett Counties, and for the relief of the dependents of employees who are killed in such mining, are well within the limits of the State's police power. p. 575

The police power is not above the Constitution, and not everything done in the name of the police power is lawful.

p. 575

The exercise of police power is always subject to considerations of constitutional limitations, when it is arbitrary, or is an undue, unjust and capricious interference with personal rights.

p. 575

*Decided May 4th, 1916.*

Appeal from the Circuit Court for Allegany County. (HENDERSON, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Ferdinand Williams,* for the appellant.

*Walter C. Capper* and *George Henderson,* for the appellee.

BURKE, J., delivered the opinion of the Court.

This is the defendant's appeal from a judgment for six hundred dollars entered against it in the Circuit Court for Allegany County. The suit was brought to recover certain assessments for which it is claimed the defendant—which is a corporation engaged in the mining of coal and clay in that county—is liable under the provisions of Chapter 153 of the Act of 1910 (page 484), as amended by the Act of 1912, Chapter 445. The single question in the case relates to the constitutionality of this legislation, and this question was raised by a demurrer to the amended declaration. It will be necessary to quote such portions of the Acts which it is claimed are invalid both under the State and Federal Constitutions. The object of these Acts was the creation of a fund to be known as "Miners and Operators Co-operative Relief Fund" for the relief and sustenance of employees injured in coal and clay mining in Allegany and Garrett Counties and the dependents of employees injured or killed in such mining.

Section 2 of Chapter 153 of the Act of 1910 declared that the word "operator," as used in the statute should include every corporation, person, partnership or association engaged in the business of coal mining or clay mining in those coun-

ties, and that the word "employee," as used therein, should include miners, helpers, laborers, drivers, trappers, roadmen, propmen, repairers, foremen, superintendents and every employee engaged directly in or about the coal and clay mine of an operator.  Provision is made as follows by section 3 of the Act for the creation and maintenance of the fund:

> "Upon each employee in Allegany and Garrett Counties, a tax of twenty-seven cents for each month or fraction of a month that he is employed by any operator, and upon each operator a like tax of twenty-seven cents for each month or fraction of a month in respect to each employee paying the tax aforesaid, and employed by said operator in Allegany and Garrett Counties.  Such tax shall be due and payable monthly to the Treasurers of Allegany and Garrett Counties, respectively, in which the mine is operated, and be payable on or before the twenty-fifth day of the month next succeeding the month for which such tax is payable.  In order to secure the effectual payment of such tax each operator is authorized and required to deduct and retain from the wages of each employee employed by him, on his pay rolls in Allegany and Garrett Counties, the sum of twenty-seven cents per month or fraction of a month, if said employee be employed for less than a month, and on or before the fifteenth day of the month next succeeding the month for which such deduction is made, shall make a report of the number of employees so employed, under oath, to the Treasurers of Allegany or Garrett County, where the particular mine is located, and on or before the twenty-fifth day of said succeeding month shall pay over unto the Treasurers of Allegany or Garrett County, as the case may be, the total amount so deducted and retained from the wages of the employees for the preceding month, together with a like amount to be paid by the operator.  It shall be the duty of the County Commissioners of Allegany and Garrett Counties, respectively, to enforce, by appropriate remedies, the collection and payment of the

tax hereby levied; and to all taxes in default there shall be added and collected interest at the rate of six per cent. per annum from the date when due."

Section 4 deals with the custody and safekeeping of the fund. Section 5 deals with the disbursements from the funds. The provisions of this section is here quoted:

"The Treasurers of Allegany and Garrett Counties, respectively, shall make payments out of the fund, when directed by the County Commissioners of each county, as follows: (*a*) In the event of personal injuries to any person received while in discharge of his duty as an employee of any operator, subject to the provisions of this Act and which shall have complied with the provisions hereof; in case of loss of: both hands, severance at or above the wrist joint, seven hundred and fifty dollars; both feet by severance at or above the ankle joint, seven hundred and fifty dollars; one hand and one foot at or above the said joints, seven hundred and fifty dollars; either hand by severance at or above the wrist joint, three hundred and seventy-five dollars; either foot by severance at or above the ankle joint, three hundred and seventy-five dollars; entire sight of both eyes, if irrecoverably lost, seven hundred and fifty dollars; entire sight of one eye, if irrecoverably lost, three hundred and seventy-five dollars. (*b*) In event of personal injuries as aforesaid resulting in any of the losses hereinbefore designated, the additional amount of one dollar per day, not including Sundays, excluding the first week following the injury, while he is being treated, for a period not exceeding twenty-six weeks. (*c*) In the event of personal injuries as aforesaid not resulting in any losses hereinbefore designated, but resulting in total disability, one dollar per day, not including Sundays, excluding the first week following the injury, for a period not exceeding fifty-two weeks. (*d*) In the event of personal injuries as aforesaid resulting in death within a period of one year, one

thousand five hundred dollars, provided that in case of any payments shall have been made on account of the above mentioned losses or disability during treatment, or total disability resulting from said injuries, the amount thereof shall be deducted from the sum payable upon death of the person injured. (*e*) In case of death resulting from having come in contact with any of the mine gases, one thousand five hundred dollars. When any such employee shall have suffered loss from injury in the discharge of his duty, as aforesaid, the County Commissioners for the county in which he shall have suffered said loss from injury, shall, within thirty days after the receipt by them of satisfactory proof thereof, direct the Treasurer of the county to pay unto said employee upon his proper receipt therefor the sum of relief money as provided herein for such loss from injury; when such injury shall result in disability as aforesaid, the said County Commissioners shall within thirty days after the receipt by them of satisfactory proof of the injury and disability, direct the said Treasurer to pay said employee the per diem relief money as herein provided. When such injury shall result in death or the employee shall have been killed by coming in contact with mine gases, as aforesaid, said County Commissioners shall, within thirty days after the receipt of satisfactory proof of the injury and death, direct the said Treasurer to pay unto the personal representative of the deceased the relief money as herein provided, to be disbursed by him under the direction of the County Commissioners, as hereinafter provided, for the sustenance of the dependents of said deceased employee. The County Commissioners shall determine the manner and form of the proof herein required; provided, that such proof shall at least consist of a certificate of the mine foreman or superintendent, and of the mine inspector, that the injury was received by the employee in the discharge of his duty, and the certificate of a reputable physician setting forth the injury in detail;

and, in the case of continuing disability, an additional certificate, monthly, of such physician, certifying as to the period that the employee has been unable to resume his duties as a direct result of the injury; and in the case of death, an additional certificate of such physician that death has resulted from said injury. If the County Commissioners shall fail or refuse to direct the Treasurer to pay or the Treasurer shall fail or refuse to pay unto any employee or personal representative of a deceased employee the relief money provided under this Act, suit may be brought by him, and in such suit the County Commissioners of the proper county shall be made defendant and shall defend such suit as other cases and have power to compromise the same in the exercise of a just discretion, and if not compromised the Court shall determine whether such relief money ought to be payable under this Act, but any judgment rendered in such cases shall only be payable out of the Relief Fund; provided, that any such suit shall be brought by the employee within twelve months from the date of the injury and by the personal representative within six months from the date of the death of the deceased employee, and failure to commence such suits within said periods shall forfeit all right or claim of said parties to any payments out of said fund."

Section 6 confers power upon the County Commissioners of the respective counties to determine certain questions arising upon the application of a personal representative of a deceased employee for relief money, and provides that:

"From any order passed by said County Commissioners under this section the personal representative or any person claiming to be a dependent may appeal within sixty days to the Circuit Court of such county, whereupon such Circuit Court shall have jurisdiction to determine the issues of fact and law raised by such appeal, and may pass such rules as may be judged necessary to expedite and effectuate the determination

of such issues, in which appeals the County Commissioners shall be party defendant."

Sections 9 and 10 of the Act are here transcribed:

"Sec. 9. No suit or action shall lie or be brought or maintained against any operator for or in respect of the death of any employee whose personal representative shall have accepted the relief money provided for in this Act, and no such suit or action shall be brought before the expiration of six months from the date of the employee's death, nor while any suit brought by the personal representative for such relief money is pending. In case any suit or action is brought against any operator by any person claiming damages for or in respect of injury or disability received in the discharge of his duty as an employee of such operator, all right and claim of such person to any payments out of the fund shall be thereby forfeited. When any person claiming that he has sustained injury or disability shall accept any relief money, provided for in this Act, for and in respect of such injury or disability, or shall commence any suit against the County Commissioners for such relief money, the operator in whose employ such persons sustained the injury or disability shall be exempt from liability therefor, and thereafter no suit or action shall lie or be brought or maintained against such operator for or in respect of such injury or disability or death resulting therefrom. Provided, that the provisions of this section shall not apply to cases where the operator has been in default in compliance with the provisions of this Act at the time of the injury, disability or death."

"Sec. 10. If any suit or action be brought against any operator for or in respect of any injury or disability received by an employee while in discharge of his duty or for death resulting therefrom, including death from contact with mine gases, and said operator shall appear and defend such suit or action, and

a judgment shall be rendered against him, he shall, after satisfying said judgment and upon filing with the County Commissioners a certified copy of said judgment and the order of satisfaction, be entitled thereafter to deduct from the payments required to be made by him hereunder to the County Treasurer, a sum equal to the amount of said judgment and costs; provided, that said operator shall have notified the County Commissioners of the pendency of said suit or action; and, provided further, that at the time of the injury, disability and death the operator has complied with the provisions of this Act."

The Act of 1912, Chapter 445, repealed and re-enacted sections 3 and 7 of the above mentioned Act, but the only provision of the amendatory Act which relates to the question before us is that which increased the tax upon operators and employees in Garrett County from twenty-seven cents per month to thirty-eight cents per month. The reasons which induced the Legislature to pass these Acts are set out in the preamble to the Act of 1910, Chapter 153, as follows:

"Whereas, it is the duty of the Government to provide sustenance in the case of helpless indigence to those who are or may become paupers and charges upon the public and is the settled practice of Governments to do so; and

"Whereas, experience has shown that the occupation of coal and clay mining in Allegany and Garrett Counties is attended with peril peculiar to the occupation itself, and that a great number of employees in the mines, without estates and having large families and dependents are annually disabled or killed in consequence of injuries sustained in their employment, and they and their families become objects of charity and charges upon the public authorities, and their infant children are unable to secure the proper support and education; and

"Whereas, it appears that such injuries, disabilities and death occur with such regularity as to be susceptible of approximation in advance and are inherent in the occupation and a part of the business itself, and the monetary loss therefrom ought to be charged up to the occupation and business; and

"Whereas, sound policy requires that some provisions be made for the sustenance of the family and dependents of such injured or disabled employees and the widows and infant children and dependents of such employee when death results from such injuries."

It is contended that this legislation is void, in that (*a*) it is an attempt to deprive the appellant of its property contrary to the law of the land, and is invalid under Article 23 of the Declaration of Rights of this State; (*b*) because it authorizes the taking of private property for public use without just compensation as agreed upon between the parties or awarded by a jury, contrary to section 40, Article 3 of the Constitution of Maryland; and (*c*) because it attempts to deprive the appellant of its property without due process of law, and denies to it the equal protection of the law, and that in these respects it violates the Fourteenth Amendment to the Constitution of the United States.

The legislation we are considering was professedly passed in the exercise of the police power of the State. That power has been the subject of a multitude of cases in all the courts in the country; but it will be sufficient to refer to a few of these adjudications which announce principles which refer more particularly to the question before us. JUSTICE MILLER, in the *Slaughter House cases,* 16 Wallace, 36, said: "This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property." It is now well settled, both in the

Federal and State courts, that this power extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State, and persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health and prosperity of the State. The provisions in the Declaration of Rights and the Fourteenth Amendment to the Constitution of the United States, relied upon by the appellant and referred to above, were not intended to restrain the reasonable exercise of the police power by the State. This has been so often declared by this and other courts that it is needless to quote authorities to support it.

In the very recent case of the *C. & P. Telephone Co.* v. *Board of Forestry,* 125 Md. 666, Judge Urner said: "The interests of the individual are subordinate to the public good, and the constitutional guarantees of the security of private property were not designed and do not operate to prohibit the reasonable restriction of its use by legislation enacted, within the sphere of the police power, for the promotion of the public welfare." That power is an attribute of sovereignty, and by its exercise the State may provide for the safety and general welfare of its people. The power, however, is not unlimited and uncontrollable. It is subject to the supervision of the courts, which have power to restrain it within reasonable limits, but in any case where the court can see that the particular act in question has a reasonable and substantial relation to the power, the court should be cautious about controlling it.

There can be no doubt that the Legislature intended by the Act of 1910, Chapter 153, to change the rules of the common law, in the classes of industry referred to in the Act, theretofore prevailing in this State governing the recovery for work accidents. It may be said that it is now generally recognized that the application of the old rules governing the relation of master and servant in certain classes of occupation are unsuitable to our changed industrial and cor-

porate condition. The application of the principles of the common law to suits for personal injuries sustained in hazardous employments resulted in many cases in injustice to the parties concerned as well as to the State. It filled the courts with litigation; it became the fruitful source of perjury; it engendered bitterness between employer and employee; it resulted in great economic waste, and it turned out an army of maimed and helpless people as dependents upon the charity of friends or the public. The operation of these rules came to be regarded as "foolish, wasteful, inefficient, and barbarous," and the national Government and a number of the States have now replaced them by efficient and humane laws.

The compulsory Workmen's Compensation Act of the State of Washington, passed in 1911, and sustained in *State* v. *Clausen*, 117 Pac. 1101, correctly stated the reasons which demanded a modification in the law regulating the relation of master and servant. It declared that: The common law system governing the remedy of workmen against employers for injuries received in hazardous employments is inconsistent with modern conditions. In practice it proves economically unwise and unfair. Its administration has produced the result that little of the cost of the employer has reached the workmen, and that little only at large expense to the public. The remedy of the workman has been uncertain, slow and inadequate. Injuries in such works, formerly occasional, have become frequent and inevitable. The welfare of the State depends upon its industries, and even more upon the welfare of its wage-earners.

The development of our mighty corporate and industrial enterprises has been attended by much human misery and suffering—the toll of human life has been appalling and the loss has fallen upon those least able to bear it. No one, who has studied the results of the application of the common law rules to work accidents in the great industrial centers of the country can doubt that laws such as those under considera-

tion, which afford a certain and speedy remedy to injured workmen and which tend to the promotion of peace between the employer and employee and the observance of greater care for the safety of the employee by his employer, have a direct relation to the general interests of the public—that they are in fact a real blessing to humanity. The evils which result to the State in the application of the old rules of employment are vividly, fully and accurately portrayed in a publication of the Russell Sage Foundation (1910), entitled "Work Accidents and the Law."

The considerations to which we have adverted are sufficient to show that the legislation assailed is well within the police power. That power, said the Court, in *State* v. *Clausen, supra,* when reduced to its ultimate and final analysis, is the power to govern. "It is not meant here to be asserted that this power is above the Constitution, or that everything done in the name of the police power is lawfully done. It is meant only to be asserted that a law which interferes with personal and property rights is valid only when it tends reasonably to correct some existing evil or promote some interest of the State, and is not in violation of any direct and positive mandate of the Constitution. The clause of the Constitution now under consideration was intended to prevent the arbitrary exercise of power, or undue, unjust, and capricious interference with personal rights; not to prevent those reasonable regulations that all must submit to as a condition of remaining a member of society. In other words, the test of a police regulation, when measured by this clause of the Constitution, is reasonableness, as contradistinguished from arbitrary or capricious action."

It is further contended that the legislation is invalid because it offends against the equal protection of the law clause of the Fourteenth Amendment. This objection is disposed of by the clear and forceful opinion filed by JUDGE HENDERSON in the lower Court. We here insert and adopt the portion of the opinion dealing with this objection: "But

the greatest stress in the argument was laid upon the equal protection of the law clause of the Constitution, and the local law is charged with being a special, unequal and unjustified burden upon certain corporations and individuals as compared with others in hazardous callings. Great reliance was placed upon the *Potomac Valley Coal Company case* in 116 Md. 380, and the cases there cited and relied upon. But that case must be read in the light of the facts, and it must be remembered that the law there questioned put upon clay and coal mining corporations and individuals the necessity of paying their men twice a month, without any reason being shown for the making of a distinction between those thus classified and others in respect of the payment of wages. In short, while admitting fully the legislative right of classification, the Court merely held that particular classification was unreasonable.

"But the courts have spoken freely and forcibly upon the topic of classification for the purpose of making special provisions for certain classes. And, while holding that 'arbitrary selection can never be justified by calling it classification'—*Gulf, Colorado & Santa Fe R. R.* v. *Ellis,* 165 U. S. 150 (41 L. Ed. 666) ; *Mo. Pac. R. R. Co.* v. *Patrick Mackey,* 127 U. S. 205 (32 L. Ed. 107)—the Supreme Court has also said, through JUSTICE FIELD, in the latter case, that legislation which is special in character is not obnoxious to the last clause of the Fourteenth Amendment, if all persons subject to it are treated alike, under similar circumstances and conditions in respect both of the privileges conferred and the liabilities imposed. He says: 'But the hazardous character of the business of operating a railway would seem to call for special legislation with respect to railroad corporations, having for its object the protection of their employees, as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employees, and no objection, therefore, can be made to the legislation on the ground of its making an unjust discrimination. It

meets a particular necessity, and all railroad corporations are, without distinction, made subject to the same liabilities. As said by the Court below, it is simply a question of legislative discretion whether the same liabilities shall be applied to carriers by canal and stage coaches, and to persons and corporations using steam in manufactories.'

"And in *Mondou* v. *N. Y. & N. H. R. R.*, 223 U. S. 1, the Court says, with reference to the confinement of the scope of the Act to interstate carriers only: 'Coming to the question of classification, it is true that the liability which the Act creates is imposed only on interstate carriers by railroad, although there are other interstate carriers, and is imposed for the benefit of all employees of such carriers by railroad who are employed in interstate commerce, although some are subjected to the peculiar hazards incident to the operation of trains, or to hazards that differ from those to which other employees in such commerce, not within the Act, are exposed. But it does not follow that this classification is violative of the "due process of law" clause of the Fifth Amendment. Even if it be assumed that the clause is equivalent to the "equal protection of the law" clause of the Fourteenth Amendment, which is the most that can be claimed for it here, it does not take from Congress the power to classify, nor does it condemn exertions of that power merely because they occasion some inequalities. On the contrary, it admits of the exercise of a wide discretion in classifying according to general, rather than minute, distinctions and condemns what is done only when it is without any reasonable basis, and, therefore, is purely aribtrary. Like classifications of railroad carriers and employees for like purposes, when assailed under the equal protection clause, have been sustained by repeated decisions of this Court. *Mo. Pac. R. R. Co.* v. *Mackey*, 127 U. S. 205 (32 L. Ed. 107); *Louisville & Nashville R. R. Co.* v. *Melton*, 218 U. S. 36 (54 L. Ed. 921); *Mobile, J & K. C. R. Co.* v. *Turnipseed*, 219 U. S. 35 (55 L. Ed. 78), 32 L. R. A. (N. S.) 226.'

"See also, *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157 (57 L. Ed. 164); *Rosenthal* v. *New York*, 226 U. S. 260 (57 L. Ed. 216), and cases there cited.

"In *Louisville & Nashville R. R.* v. *Melton*, 218 U. S. 36 (54 L. Ed. 928), this language occurs: "' The equal protection of the law clause.'' That the Fourteenth Amendment was not intended to and does not strip the States of the power to exert their lawful police authority, is settled and requires no further reference to authorities. And it is equally well settled—as we shall hereafter take occasion to show— as the essential result of the elementary doctrine that the equal protection of the law clause does not restrain the normal exercise of governmental power, but only abuse in the exercise of such authority. Therefore, that clause is not offended against simply because, as the result of the exercise of the power to classify, some inequality may be occasioned. That is to say, as the power to classify is not taken away by the operation of the equal protection of the law clause, a wide scope of legislative discretion may be exerted in classifying without conflicting with the constitutional prohibiton.

" 'It is beyond doubt foreclosed that the Indiana statute does not offend against the equal protection clause of the Fourteenth Amendment because it subjects railroad employees to a different rule as to the doctrine of fellow-servant from that which prevails as to other employments in that State. *Tullis* v. *Lake Erie & W. R. R.*, 175 U. S. 348 (44 L. Ed. 192); *Pittsburgh, C. C. & St. L. R. R. Co.* v. *Ross*, 212 U. S. 560 (53 L. Ed. 652).'

"In *Mobile, J. & K. C. R. Co.* v. *Turnipseed*, 219 U. S. 35 (55 L. Ed. 78), JUSTICE LURTON says: 'Section 3559 of Mississippi Code of 1892 abrogates substantially the common law fellow-servant rule as to "every employee of a railroad corporation." It is urged that this legislation, applicable only to employees of a railroad company, is arbitrary and a denial of the equal protection of the law, unless it be limited

in its effect to employees imperiled by the hazardous business of operating railroad trains or engines. * * * It is now contended that the provision has been construed in the present case as applicable to an employee not subject to any danger or peril peculiar to the operation of railway trains, and that, therefore, the reason for such special classification fails, and the provision so construed and applied is invalid as a denial of the equal protection of the law.

" 'This contention, shortly stated, comes to this, that although a classification of railway employees may be justified from general considerations based on the hazardous character of the occupation, such classification becomes arbitrary and a denial of the equal protection of the law the moment it is found to embrace employees not exposed to hazards peculiar to railway operation.

" 'But this Court has never so construed the limitations imposed by the Fourteenth Amendment upon the power of the State to legislate with reference to particular employments, as to render ineffectual a general classification resting upon obvious principles of public policy, because it may happen that the classification includes persons not subject to a uniform degree of danger.'

"And in Maryland the same general rules are followed. *Ruggles* v. *State*, 120 Md. 553.

"That the dangerous nature of mining operations renders it the proper subject of special regulation by the States under the police power has been frequently judicially determined.

"*Plymouth Coal Co. v. Penna.*, 232 U. S. 531-40 (58 L. Ed. 717); *Holden* v. *Hardy* 169 U. S. 366-393 (42 L. Ed. 780), where the subject of mining and its development is reviewed.

"Applying these doctrines to the law questioned in this case, there would seem to be no serious objection to the classification of those engaged in mining coal and clay in a group by themselves, although there are other dangerous occupa-

tions to which the law does not apply. The provisions of the law are applicable to all alike in the business, whether operators or miners (and these terms are made all inclusive by the definition in the law), within the two counties of Allegany and Garrett. There seems to be no reason, in law or in fact, why coal and clay miners can not be specially provided for by themselves, if railroad men can be, as we have seen may be done in the above cases. The special risks of this employment, as compared with others, gives a legal basis for special classification, and within the class all are treated alike 'in respect both of the privileges conferred and the liabilities imposed.' The restriction of the law to Allegany and Garrett Counties can prove no stumbling block for such local limitations are recognized as legal and proper, if all within the selected locality are treated alike and the locality itself is broad enough to work no harmful discrimination. * * * The classification, therefore, is in fact all-inclusive; it rests upon a natural, reasonable and essential basis of difference between this and other industries, and is therefore sound."

It is further objected that the employee may refuse to accept compensation under the Act, and bring suit against the operator after he has gone out of business, and since the law in that event makes no provision for the return of the amount paid in he might be compelled to pay twice for the same injury, viz, the judgment recovered and twenty-seven or thirty-eight cents per month as the case may be. No such case has arisen so far as we are informed, but it must be admitted that such a contingency might arise, but this possible contingency ought not to operate to strike down an Act which is supported by strong considerations of public justice, and which is so manifestly promotive of the general interest of the State. *State Noble Bank* v. *Haskell,* 219 U. S. 104.

*Judgment affirmed, the appellant to pay the costs.*