SUSAN E. BAYNE ET AL. *v.* SECRETARY
OF STATE ET AL.

[No. 37, September Term, 1978.]

*Per Curiam Order August 17, 1978.*

*Opinion Filed October 9, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ■LEVINE, ORTH and COLE, JJ., and JAMES C. MORTON, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*James G. Kolb* for appellants.

*Thomas E. Plank, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellees.

ORTH, J., delivered the opinion of the Court.

This case concerns the interplay between two amendments to the Constitution of Maryland made within a year of each other more than sixty years past. One, proposed by Acts 1914, ch. 673 and ratified at the election of 2 November 1915, added art. XVI and created "The Referendum." The other, the "budget amendment," proposed by Acts 1916, ch. 159 and ratified at the 1916 election, added § 52 to art. III and established a comprehensive executive budget system for the State of Maryland, including the requirement that "[e]very appropriation bill shall be either a Budget Bill, or a Supplementary Appropriation Bill. . . ." Md. Const., art. III, § 52 (2). We were called upon to decide whether a part of the Budget Bill for the fiscal year ending 30 June 1979 (Acts 1978, ch. 44) was subject to The Referendum. Through a per curiam order issued 17 August 1978, we held that it was not. We now give our reasons.

## I

Item 32.01.05.03 of the Budget Bill for fiscal year 1979 designated an appropriation for "Medical Assistance Provider Reimbursements" relating to a "Medical Care Program" generally called the Maryland Medicaid Program. The appropriation is a composite of state and federal funds and is designed to provide direct payments to physicians, hospitals, clinics and other medical facilities undertaking to provide medical and hospital care for indigent persons. The Budget Bill was approved on 11 April 1978 [1] with a rider attached to the appropriation:

"Provided that no part of this General Fund appropriation may be paid to any physician or surgeon or any hospital, clinic or other medical facility for or in connection with the performance of any abortion, except upon certification by a physician or surgeon, based upon his or her professional judgment, that the procedure is necessary, provided one of the following conditions exists:

1. Where continuation of the pregnancy is likely to result in the death of the woman; or
2. Where there is a risk that continuation of the pregnancy would have a detrimental effect on the health of the woman; or
3. Where there is a risk of the birth of the child with permanent physical deformity, genetic defect or mental retardation; or
4. Where medical procedures are necessary for a victim of rape, sexual offense or incest, when the rape, sexual offense or incest has been reported to a law enforcement agency or to a public or private health or social agency."

A petition was filed with the Secretary of the State to invoke The Referendum with respect to exceptions (2), (3) and

---

1. "[S]uch bill, when and as passed by both Houses, shall be a law immediately without further action by the Governor." Md. Const., art. III, § 52 (6). *See* Dorsey v. Petrott, 178 Md. 230, 242, 13 A. 2d 630 (1940).

(4) of the Medical Assistance Provider Reimbursements appropriation. The Secretary refused to take action to verify the signatures on the petition. He stated that no additional signatures would be accepted if proffered and made clear that the matter presented by the petition would not be certified to the boards of election to be placed on the ballot at the 1978 general election.

On 13 June 1978, Susan E. Bayne and John M. Leonard, appellants, on their own behalf and on behalf of others, all Maryland citizens, taxpayers, and registered voters and signatories to or sworn petition carriers of and proponents of the referendum petition, instituted an action for a writ of mandamus and mandatory injunction in the Circuit Court for Montgomery County against Fred L. Wineland, Secretary of the State of Maryland, Blair Lee, III, Acting Governor of Maryland and Willard A. Morris, Administrator of the State Administrative Board of Election Laws, appellees. Appellants claimed that they would suffer irreparable harm if appellees prevented them from complying with the mandatory time limits imposed by law. They alleged that unless the court immediately ordered appellees to accept the referendum petition and to certify the signatures, the question could not be posed in the 1978 elections. They requested the court to command appellees to accept and cause the signatures obtained to be verified, to accept and verify additional signatures to be obtained as provided by law, and, in the event the required number of signatures were received, to certify the question to the boards of election to be placed on the ballot at the 1978 general election. If the question was so referred to the voters, and the designated exceptions were approved by the people, appellants further asked that appellees be enjoined from proceeding under the exceptions until thirty days after such approval.

Upon hearing, the circuit court denied appellants' motion for summary judgment and granted appellees' motion for summary judgment. Judgment was entered in favor of appellees for costs. Appellants noted an appeal to the Court of Special Appeals. We granted appellants' petition for a writ of certiorari before decision by the intermediate court. The

petition for the writ presented for resolution on review as the sole question decided below:

> "Is that portion of the budget bill affecting the appropriation for the State's Medicaid Program sought to be petitioned to referendum an 'appropriation for maintaining the State government' and therefore not subject to rejection or appeal by referendum under Article XVI of the Maryland Constitution?"

Upon consideration of briefs filed and argument heard, we affirmed the judgment of the trial court by our order as indicated with the mandate to issue forthwith.

## II

Prior to the constitutional amendment, legislative referendum with respect to a law of general applicability did not exist in Maryland. This Court had consistently held that to condition the operative effect of such a law upon approval by the voters of the State was an improper delegation of legislative authority. *Cole v. Secretary of State,* 249 Md. 425, 434, 240 A. 2d 272 (1968), citing *Hammond v. Haines,* 25 Md. 541, 90 Am. Dec. 77 (1866) and *Burgess v. Pue,* 2 Gill 11 (1844). The scope, mechanism, operation and effect of the referendum power reserved by the amendment are prescribed and defined in the six sections of art. XVI. *Dorsey v. Petrott,* 178 Md. 230, 234, 13 A. 2d 630 (1940); *Dinneen v. Rider,* 152 Md. 343, 355, 136 A. 754 (1927); *Beall v. State,* 131 Md. 669, 678, 103 A. 99 (1917). *See Ritchmount Partnership v. Board of Sup'rs,* 283 Md. 48, 60-61, 388 A. 2d 523 [, 531-532] (1978); *Anne Arundel Co. v. McDonough,* 277 Md. 271, 283, 354 A. 2d 788 (1976). Section 1 is the heart of the amendment.

> "(a) The people reserve to themselves power known as The Referendum, by petition to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly, if approved by the

Governor, or, if passed by the General Assembly over the veto of the Governor;

"(b) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted."

*See* Maryland Code (1957, 1976 Repl. Vol., 1977 Cum. Supp.) art. 33, §§ 23-1, *et seq.*

The general application of The Referendum is subject to three express limitations. Section 2 of art. XVI contains two of them:

"No law making any appropriation for maintaining the State Government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to rejection or repeal under this Section." [2]

The third limitation appears in § 6:

"No law or Constitutional Amendment, licensing, regulating, prohibiting, or submitting to local option, the manufacture or sale of malt or spirituous liquors,

---

2. The 1968 constitutional convention addressed The Referendum at some length. A study document prepared by Frank T. Ralabate, research assistant to the Constitutional Convention Commission, indicated that only two types of legislation were excepted from the operation of art. XVI. It deemed the above quoted provisions of § 2 to encompass one exception (the provisions of § 6 being the other), stating: "Appropriation measures are not subject to referendum unless they exceed the previous appropriation made for the same purpose, and then only that amount in excess of the prior appropriation is subject to referendum." Constitutional Revision Study Documents of the Constitutional Convention Commission of Maryland 67-68 (1968). The language and punctuation of the quoted part of § 2 was in the original bill, SB105, introduced 3 March 1914 by William J. Ogden, Democrat, Baltimore County. The phrase set off by commas, "not exceeding the next previous appropriation," seems only to apply, however, to appropriations "for maintaining or aiding any public institution" and not to appropriations "for maintaining the State Government." This construction is supported by the language of the sentence immediately following: *"The increase in any such appropriation for maintaining or aiding any public institution* shall only take effect as in the case of other laws, and such increase or any part thereof specified in the petition, may be referred to a vote of the people upon petition." (Emphasis added). In other words, by its own language, art. XVI does not appear to apply to any appropriation for the maintenance of State Government even if that appropriation did exceed the previous year's request. Bickel v. Nice, 173 Md. 1, 10, 192 A. 777 (1937).

shall be referred or repealed under any Act of the provisions of this Article." [3]

## III

We have traced the history of the budget amendment, now embodied in the Constitution of Maryland as § 52 of art. III, discussed its provisions and explained its operation, in a number of cases. *Md. Act. for Foster Child. v. State,* 279 Md. 133, 140-147, 367 A. 2d 491 (1977); *Panitz v. Comptroller,* 247 Md. 501, 505-509, 232 A. 2d 891 (1967); *McKeldin v. Steedman,* 203 Md. 89, 96-100, 98 A. 2d 561 (1953); *Dorsey v. Petrott,* 178 Md. at 241-245; *Baltimore v. O'Conor,* 147 Md. 639, 644-646, 128 A. 759 (1925). The amendment was prepared by a Commission appointed by the Democratic State Convention held in Baltimore in 1915. The Commission, designated "The Commission on Efficiency and Economy," was chaired by Dr. Frank J. Goodnow, president of Johns Hopkins University, and a noted political scientist. *Panitz* at 507. We summarized the reasons for the amendment in *O'Conor:*

> "Prior to the adoption of the Budget Amendment by the people of the State in 1916, there was no orderly plan or system which the General Assembly was required to follow in disbursing the State's revenues, and as a result appropriations were more or less uncorrelated and deficits in the State treasury were not unusual. The purpose of the Budget Amendment was to remedy this situation by providing an intelligent and definite method of estimating and appropriating the income of the State." *Id.,* 147 Md. at 644.

The Governor sent the Goodnow report and its "accompanying Bill" to the Senate "for its prompt and favorable consideration." A copy of the report was published in the *Journal of Proceedings of the Senate* of 28 January

---

3. An amendment deleting the phrase "or Constitutional Amendment" was proposed by Acts 1977, ch. 681 and will be voted upon at the next general election to be held in November 1978.

1916, pp. 129-134. It reflected the Commission's concern with cutting the cost of government through more efficient organization and management and with insuring that government expenditures should not exceed revenues. The Commission observed that its first thought in drafting the amendment was "[t]o impose on the Governor the sole responsibility, *within the limits of the Constitution* and the provisions of existing law, of presenting to the Legislature a complete and comprehensive statement of the needs and resources of the State. . . ." *Journal of Proceedings of the Senate,* 28 January 1916 at 133. (Emphasis added). It rejected out of hand dilution of the control vested in the Governor. In explaining why it chose the Governor alone over the Board of Public Works, it said: "[T]o make use of the Board of Public Works as a Budget Commission would have the disadvantage of dissipating personal responsibility for financial propositions, and would also run the risk of not securing party responsibility." *Id.* at 131. It appears that the Commission was suggesting that if the Governor proposed an unpopular budget he and his party could be held accountable at the polls in subsequent Gubernatorial elections, but in the meantime the size of the budget would remain the sole responsibility of the Governor within certain well-defined limits. It is not surprising then, that in neither the Governors' papers, nor the legislative Journals is there any indication that the Commission or the Legislature were concerned with the possibility that the Budget Bill was subject to referendum. But, of course, The Referendum was in existence at the time the budget amendment was proposed and passed, and subsection 14 of the budget amendment declared, with specific exceptions:[4] "In the event of any inconsistency between any of the provisions of this Section and any of the other provisions of the Constitution, the provisions of this

---

4. The exceptions are: "But nothing herein shall in any manner affect the provisions of Section 34 of Article 3 of the Constitution or of any laws heretofore or hereafter passed in pursuance thereof, or be construed as preventing the Governor from calling extraordinary sessions of the General Assembly, as provided by Section 16 of Article 2, or as preventing the General Assembly at such ertraordinary [extraordinary] sessions from considering any emergency appropriation or appropriations."

Section shall prevail." It was in the light of the provisions of subsection 14 that we said in *Dorsey,* 178 Md. at 241: "The Budget Amendment was not designed to interfere with the operation of the Referendum Amendment." Although it may appear that to have the whole of State government brought to a standstill while a Budget Bill was before the voters on referendum would run counter to all the Commission stood for, being against its basic philosophy and the rationale and raison d'être of the Bill it proposed, there is no indication that the Commission, the Legislature and the Governor were not content that any matter of referendum regarding a Budget Bill was to be resolved within the strictures of the referendum amendment itself.

## IV

In accord with the conclusion of our predecessors that the budget amendment was not designed to interfere with the operation of the referendum amendment, so that a Budget Bill is not *per se* excluded from The Referendum, we look to the limitations imposed by the amendment itself.[5]

Patently, the limitation imposed by § 6, pertaining to the manufacture or sale of malt or spirituous liquors, has no relation to the case at bar.[6] Equally apparent is that this case is not within the ambit of the provision of § 2 which excludes a law "for maintaining or aiding any public institution. . . ." The appropriation made by Item 32.01.05.03 of the Budget Bill is not concerned with a public institution but with reimbursing medical assistance providers under the Maryland Medical Care Program. Appellants agree that the only exception to be considered is that with respect to a law

---

5. We note that it is not suggested that there was other than full compliance with the procedural formalities for the submission of the part of the law for which referendum was sought.

6. The study document prepared by Frank T. Ralabate, research assistant to the Constitutional Convention Commission, concluded: "The present provisions of Article XVI which limits the bills that are referable are satisfactory with the exception of Section 6. That section was added in order to facilitate the passage of Article XVI. Having served its purpose, the section should be deleted." Constitutional Revision Study Documents of the Constitutional Convention Commission of Maryland 66, 77 (1968).

"making an appropriation for maintaining the State Government." This limitation has two requirements for the exclusion of a law from The Referendum: (1) the law must make an "appropriation" of public funds, and (2) such appropriation must be for "maintaining the State Government." *Dorsey v. Petrott,* 178 Md. at 245, points out that "although an act of the General Assembly may be passed for the purpose of maintaining the State government, the act is nevertheless subject to The Referendum, unless it be an act . . . appropriating public funds for that purpose." *Dorsey* defines an "appropriation":

> "[A]n appropriation of public funds is made by a constitutional mandate or a lawful legislative act whose primary object is to authorize the withdrawal from the state treasury of a certain sum of money for a specified public object or purpose to which such sum is to be applied."

Clearly, § 32.01.05.03 of the Budget Bill makes an appropriation within the contemplation of art. XVI, § 2. Appellants concede, "for the purpose of argument, that the conditions should be considered an 'appropriation'. . . ." They urge, however, that the appropriation is not within the limitation in that it does not maintain the State Government. The crux of their argument is that "[t]he provision of medical services to indigent persons is not a primary function of government." We are not in accord with this view.

Almost a century ago, this Court declared that the preservation of the health of the inhabitants is one of the chief purposes of government. *Boehm v. Baltimore,* 61 Md. 259, 263 (1884). We said in *State v. Hyman,* 98 Md. 596, 613, 57 A. 6 (1904): "One of the legitimate and most important functions of civil government is acknowledged to be that of providing for the welfare of the people by making and enforcing laws to preserve and promote the public health. . . ." We have not departed from this view. *See Stevens v. City of Salisbury,* 240 Md. 556, 564, 214 A. 2d 775 (1965); *Wynkoop v. Hagerstown,* 159 Md. 194, 201, 150 A. 447 (1930); *American Coal Co. v.*

*Allegany Co.,* 128 Md. 564, 572-573, 98 A. 143 (1916); *Welch v. Coglan,* 126 Md. 1, 7, 94 A. 384 (1915). It is also generally recognized that the relief of indigent persons is a function of government. *See Alameda County v. Janssen,* 16 Cal. 2d 276, 106 P. 2d 11, 15 (1940); *State v. Lindstrom,* 68 Idaho 226, 191 P. 2d 1009, 1012 (1948); *People v. Lyons,* 374 Ill. 557, 30 N.E.2d 46, 50 (1940); *Bowman v. Frost,* 289 Ky. 826, 158 S.W.2d 945, 947 (1942); *Thiede v. Town of Scandia Valley,* 217 Minn. 218, 14 N.W.2d 400, 407 (1944); *Busser v. Snyder,* 282 Pa. 440, 128 A. 80, 84-85 (1925); *Kenny v. County Court of Webster County,* 124 W. Va. 519, 21 S.E.2d 385, 387 (1942). We conclude that the provision of medical services for indigent persons is a primary function of government. The question then is whether an appropriation to carry out that function is an appropriation for "maintaining the State Government," so as to invoke the referendum limitation. *Winebrenner v. Salmon,* 155 Md. 563, 142 A. 723 (1928) is dispositive of the question. In that case the law sought to be referred provided for an addition to the license tax on motor vehicle fuel, the proceeds of which were to be applied to constructing lateral roads by the State. After concluding that the law was a supplemental appropriation act, this Court found that the appropriation was for "maintaining the State Government." It stated that the purpose of the limitation was "to provide against the possibility of the government being embarrassed in the performance of its various functions." *Id.* at 568. The Court went on:

> "Surely, in that view, 'appropriations for maintaining the government' include more than merely those which provide for overhead expenses, such as salaries and expenses incident to keeping the government afloat as a going concern. 'The government' includes all its agencies, of which the State Roads Commission is one of the most important. And maintaining the government means providing money to enable it to perform the duties which it is required by law to perform." *Id.*

There was a caveat:

> "Certainly an act would not be within the exception merely because it carried an appropriation to an agency of the government, if it *created* an entirely new function not theretofore recognized as coming within the sphere of governmental activity. But 'the establishment, construction and maintenance of public roads is a primary function of government'."
> *Id.*, quoting *Bonsal v. Yellott*, 100 Md. 481, 507, 60 A. 593 (1905).

The Court traced the history of State road legislation and found that the act in question added no new functions to those previously exercised by the State in the matter of the work of road construction. *Id.* at 570.

We followed and applied *Winebrenner* in *Bickel v. Nice*, 173 Md. 1, 192 A. 777 (1937), concluding that "[h]ousing for state officers and employees would seem to be as much a primary function of government as building lateral roads, and equally entitled to be classed as maintaining the government." *Id.* at 10. We observed:

> "It is undoubtedly true that the actuating purpose of the excepting clause was to prevent interruptions of government. But the court is of opinion that the test intended by the excepting clause is not the need of the appropriation or the project to carry out that purpose, but the design. If the particular appropriation is one designed for maintaining the government and the project stated is of a kind that may be within that classification of maintaining the government, it is excepted." *Id.*

The Department of Health and Mental Hygiene is one of the more important agencies of the State. In furtherance of the primary function to provide medical services for indigent persons, the General Assembly prescribed that "[t]he Secretary of Health and Mental Hygiene shall administer a program of comprehensive medical and other care in the State for indigent and medically indigent persons, or either of those

classes." Md. Code (1957, 1971 Repl. Vol., 1977 Cum. Supp.) art. 43, § 42 (a) (1). This is not a new function. Such a program has been in existence and funded by the State for more than thirty years. *See* Acts 1945, ch. 91. Under the rationale of *Winebrenner* and the test in *Bickel,* we determine that the appropriation here was for "maintaining the State Government."

Appellants would have us reach a contrary conclusion because the funds appropriated were to be paid to private individuals. In furtherance of the comprehensive medical health program it ordained, the Legislature authorized the Secretary to contract with physicians, hospitals, clinics, insurance companies and various other private individuals, groups and companies for the provision of care of eligible persons. Code (1957, 1971 Repl. Vol., 1977 Cum. Supp.) art. 43, § 42 (a) (2). It may be that the private parties agreeing to render medical care provide services which supplement those already in existence through the Department, but implicit in the Legislature's authorization of private parties is that they are necessary to carry out the medical care program. In the circumstances, the appropriation to pay them was no less designed to maintain the government because they were not a part of the government.

It appears that the Department of Health and Mental Hygiene proposed to apply about a million and a half dollars of the appropriation in Item 32.01.05.03 of the Budget Bill to Medicaid abortion funding. This is not constitutionally proscribed. *Roe v. Wade,* 410 U.S. 113, 153, 93 S. Ct. 705 (1973); *Maher v. Roe,* 432 U.S. 464, 471-472, 97 S.Ct. 2376 (1977). It was to the expenditure of those funds that the General Assembly directed the conditions. Appellants argue that they are attempting to petition to referendum a question of policy written into the Budget Bill and suggest that this is permitted under *Winebrenner.* The language in *Winebrenner* on which they apparently rely was with reference to the provision in the amendment which expressly allows the submission of "part of any act." The Court said:

> "In *State v. Clausen,* 85 Wash. 260, it was argued
> that there were a number of questions of policy in

the act there under consideration which were peculiarly within the purview of the referendum, and that the people should not be precluded from the right to vote on such questions by attaching an appropriation to the act. The answer of the court was: 'The people very wisely forestalled the possibility of the situations suggested by counsel, when they reserved the right to refer a part of the bill. Their evident purpose was to prevent the stoppage of the State's established functions pending a vote upon some question of policy.' " *Winebrenner,*155 Md. at 571.

It is correct that "[t]he function and effect of the Budget Bill as a law is restricted by its purposes, and the mechanics set up by Section 52 of Article III [of the Maryland Constitution] carry out those purposes. That function and effect is to appropriate money, not to legislate generally. . . ." 37 *Opinions of the Attorney General* 139, 141 (1952). The conditions here, however, reflect no attempt to establish policy by general legislation. The General Assembly's authority to reduce or strike out an item of appropriation necessarily includes the authority to condition or limit the use of money appropriated, or the use of the facility for which the money is appropriated, provided the condition or limitation is directly related to the expenditure of the sum appropriated, does not, in essence, amend either substantive legislation or administrative rules adopted pursuant to legislative mandate, and is effective only during the fiscal year for which the appropriation is made. *See* 63 *Opinions of the Attorney General,* (1978) [The Daily Record 1 September 1978]. The conditions here meet this test. These are an integral part of the appropriation, directly related to the spending of the sum appropriated. They do not constitute an amendment of substantive legislation or administrative rules adopted pursuant to a legislative mandate; they do not require that the program of Medical Assistance be implemented in a manner contrary to statute or regulation. And, of course, the conditions are effective only during the fiscal year for which the appropriation was provided.

In *Berlin v. Shockley,* 174 Md. 442, 199 A. 500 (1938), we dealt with the provision of the referendum amendment expressly providing for submission of "part of any act," as being cited as a statement that part of an excepted law might be referred. We were "constrained to hold that the constitutional provision does not permit it." *Id.* at 446. We said:

> "An association in a single enactment of a referable law and one of the kinds excepted from the referendum, if that would be feasible without violation of the constitutional prohibition in article 3, section 29, against including more than one subject, might, perhaps, be found to leave part of an enactment referable, but not part of the excepted law. That law, with its incidents, still could not be referred." *Id.*

We turned to the case then before us:

> "The system of sale of liquor through a public dispensary requires as a necessary incident some disposition of profits if there should be any; and the provision for it could not be regarded as unrelated and merely associated. There seems to the court to be no authority for lifting it out of the excepted law as sought in these cases." *Id.*

*See* Everstine, *The Legislative Process in Maryland,* 10 Md. L. Rev. 91, 148 (a part of an excepted act is not referable to referendum). The conditions here, being part of an excepted law, may not be lifted out and referred.

*Summary*

No law making any appropriation for maintaining the State Government may be subject to The Referendum. If an appropriation is for a primary function of the State, it is for maintaining the State Government. A program of comprehensive medical care for indigent and medically indigent persons is an established primary function of the State. The program may be carried out not only by State employees and facilities but also by private persons and

facilities necessary to its fulfillment. Abortions are a proper aspect of the program at the instance of the Legislature.[7] The Legislature may place conditions on the Budget Bill with respect to the sum appropriated for the program without violating the prohibition against "legislating in the budget" provided the conditions are directly related to the expenditure of the sum appropriated, do not amend substantive legislation or duly adopted administrative rules and are effective only during the fiscal year for which the appropriation is made. A part of an excepted law is ordinarily not referable. In the light of these criteria, the part of the Budget Bill appellants seek to refer to the voters is not subject to The Referendum.

---

7. There is an interest protected by the federal constitution "in making certain kinds of important decisions" free from governmental compulsion. Maher v. Roe, 432 U. S. 464, 473, 97 S. Ct. 2376 (1977), quoting Whalen v. Roe, 429 U. S. 589, 599-600, and nn. 24 and 26, 97 S. Ct. 869 (1977). But there is no unqualified constitutional right to an abortion. Roe v. Wade, 410 U. S. 113, 153, 93 S. Ct. 705 (1973). "Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. It implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." Maher at 473. "The State unquestionably has a 'strong and legitimate interest in encouraging normal childbirth,' . . . an interest honored over the centuries." Id. at 478, quoting Beal v. Doe, 432 U. S. 438, 446, 97 S. Ct. 2366 (1977). The Court in Maher noted, at 478, n. 11:

> "In addition to the direct interest in protecting the fetus, a State may have legitimate demographic concerns about its rate of population growth. Such concerns are basic to the future of the State and in some circumstances could constitute a substantial reason for departure from a position of neutrality between abortion and childbirth."

We observe, however, that the courts have no power to consider the wisdom of legislation. Bickel v. Nice, 173 Md. 1, 11, 192 A. 777 (1937).