530 A.2d 245

Winfield M. KELLY, Jr. and Greater Baltimore
Committee, Inc. et al.

v.

MARYLANDERS FOR SPORTS SANITY, INC. et al.

No. 75, Sept. Term, 1987.

Court of Appeals of Maryland.

Sept. 8, 1987.

438

J. Joseph Curran, Jr., Atty. Gen., Judson P. Garrett, Jr., Deputy Atty. Gen., Baltimore and Robert A. Zarnoch, Asst. Atty. Gen. (Linda H. Lamone, Asst. Atty. Gen. and Catherine E. Bocskor, Sp. Asst. Atty. Gen., Annapolis, on the brief), for appellant Secretary of State; George A. Nilson (Sheila Mosmiller Vidmar, John A. Singer and Piper & Marbury, on the brief), Baltimore, Md., for Greater Baltimore Committee, Inc. et al.

Ronald L. Early (Harry W. Lerch, and Lerch, Early, Roseman & Frankel, Chartered, on the brief), Bethesda, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

Article XVI of the Constitution of Maryland, entitled "The Referendum," in § 1(a), reserves to the people the power "to have submitted to the registered voters of the State, to approve or reject at the polls, any Act, or part of any Act of the General Assembly...." Section 2 of Art. XVI limits the right of referendum, in pertinent part, as follows:

"No law making any appropriation for maintaining the State Government, or for maintaining or aiding any public institution, not exceeding the next previous appropriation for the same purpose, shall be subject to rejection or repeal under this Section."

The primary issue in this case is whether enactments of the General Assembly in 1987 involving the Maryland Stadium Authority constitute laws "making any appropriation for maintaining the State Government."

I.

The Maryland Stadium Authority was created by ch. 283 of the Acts of 1986, codified as Maryland Code (1986 Repl.Vol.), §§ 13–701 to –722 of the Financial Institutions Article. By this legislation, the Authority was designated as a public corporation and instrumentality of the State. For budgetary purposes, it was included as a unit of the Department of Economic and Community Development. § 13–702. The five members of the Authority, appointed by the Governor with the advice and consent of the Senate, § 13–703, were empowered to determine the location of, and construct and maintain "facilities to the extent necessary to accomplish [its] purposes." § 13–708(6). Under § 13–701, a "facility" includes, in addition to the site, "stadiums for the primary purpose of holding professional football games, major league professional baseball games, or both, in the Baltimore metropolitan area."

The Authority was vested with broad power to regulate the use and operation of its facilities and to charge fees

therefor. § 13–708(9) and (10). Subject to the approval of the Board of Public Works, the Authority was authorized to borrow money from any source for any corporate purpose and to mortgage or otherwise encumber its property. § 13–708(11). Subject to the same approval, the Authority was permitted to issue bonds in connection with its acquisition and construction of facilities, the debt service on the bonds to be payable solely from the Authority's revenues. § 13–708(12); § 13–712. The Authority was empowered, by gift or purchase, to acquire any property needed "to construct or operate any facility." § 13–711(a). Prior to selecting a facility site, it was required to hold a hearing for the purpose of obtaining public comment. § 13–709. It was also required, before acquiring a facility site, or before entering into a construction contract involving a facility, to submit a detailed written report to the General Assembly and Board of Public Works justifying its proposed action, including the method of funding and the economic necessity for the facility. § 13–710. Notification to the Legislative Policy Committee thirty days prior to acquiring a facility site was also required by this section. In addition, the Authority was directed to obtain prior approval both of the Board of Public Works and the General Assembly "for the acquisition of the site for the stadium" and to obtain the approval of the Board of Public Works before contracting for the acquisition of the facility site. § 13–710.

Section 13–715 created a Maryland Stadium Authority Financing Fund "as a nonlapsing revolving fund" to be used by the Authority "for carrying out the provisions of this subtitle." The Authority was required by this section to place receipts in the Financing Fund from the sale of its bonds and from other revenues generated from other sources.

Consistent with its statutory purpose, the Authority engaged consultants to consider various sites for its contemplated sports facilities. After studying the consultants' report, the Authority recommended an 85–acre tract in Baltimore City, known as Camden Yards, as the most

appropriate site. It concluded that the Camden Yards site could be acquired for 72.3 million dollars; that a baseball stadium could be erected on the site for 61.8 million dollars, and a football stadium for 67 million dollars—a total cost of 201.1 million dollars in January 1987 dollars.

On December 5, 1986, the Authority gave the requisite statutory notice of its intention to recommend the Camden Yards site for the location and construction of the sports facilities. Three bills were thereafter introduced in the 1987 session of the General Assembly as administration measures. The first, S.B. 228, which upon its enactment became ch. 122 of the Acts of 1987, was entitled "Maryland Stadium Authority—Approval of Facility Site at Camden Yards." This bill amended § 13–709 of the Financial Institutions Article by authorizing the Authority to construct or enter into a contract for a facility on the Camden Yards site.

The second bill, S.B. 230, which upon its enactment became ch. 123 of the Acts of 1987, was entitled "Maryland Stadium Authority—Powers and Duties." This bill also amended a number of sections relating to the Maryland Stadium Authority in the Financial Institutions Article. Specifically, the Authority was designated as an independent unit in the Executive Branch of State Government. § 13–702(c). It was authorized to acquire property in the Camden Yards site by ordinary or quick-take condemnation. The bill also amended § 13–715(c) by adding a new subparagraph (5) which specified that, in addition to other receipts of the Authority required to be deposited in its Financing Fund, "additional revenue, gift, donation, or other source [of funds] authorized by law" must also be so deposited in connection with the financing of the site acquisition and construction of the sports facilities. The Authority was required by § 13–719(5) to submit "annually a budget reflecting the operating and capital program of the Authority to the Department of Budget and Fiscal Planning for inclusion for informational purposes in the State Budget Book."

The effectiveness of the bill was made contingent upon the enactment of ch. 122.

The third bill, S.B. 847, which upon its enactment became ch. 124 of the Acts of 1987, was entitled "Maryland Stadium Authority—Financing." It amended a number of sections in the Financial Institutions Article, in the State Finance and Procurement Article, and in the State Government Article of the Code. By its preamble, this bill recited the intention of the General Assembly that, to the maximum extent economically justifiable, the Authority "finance the construction of the facility with private, rather than public, investment"; and that the Authority solicit and evaluate proposals from private investors for financing such structures, thereby "to minimize the use of State lottery and other revenues and the risk to the State's revenue base and credit ratings."

The bill provided in amended § 13–712(a)(1)(II) of the Financial Institutions Article that, absent additional approvals, the Authority's power to issue bonds for the purpose of financing site acquisition and construction of the sports facility was limited to: (1) 85 million dollars for site acquisition at Camden Yards; (2) 70 million dollars for construction of a baseball stadium; (3) 80 million dollars for construction of a football stadium, and (4) 195 million dollars for construction of a multi-use stadium. New § 13–712.1(1) of the Financial Institutions Article requires that prior to sale of its bonds to finance any segment of the facility, the Authority must make a certification and report to the Legislative Policy Committee and Board of Public Works that it "endeavored to maximize private investment in the facility proposed to be financed and to maximize the State's ability to assure that the professional baseball and football franchises will remain permanently in Maryland." Section 13–712.1(2) requires the Authority to provide to the fiscal committees of the General Assembly, prior to seeking approval for each bond issue, "a comprehensive financing plan for the relevant segment of the facility and the effect of this financing plan on financing options for other segments

of the facility, including anticipated revenues from private investment where applicable." This section, in subparagraph (3), also requires the approval of the Board of Public Works of the proposed bond issue and financing plan. Subparagraph (4) of this section conditions the issuance of the bonds upon securing: (1) in connection with site acquisition and construction of a baseball stadium, a long-term lease for a major league professional team and (2) in connection with site acquisition and construction of a football stadium, a franchise for a National Football League team and a long-term lease.

The bill provided in amended § 13–711(b)(2) and (3) that subject to the prior approval of the Board of Public Works, "the State may lease or sublease any facility from or to the Authority, whether or not constructed or useable"; and that lease payments to the Authority appropriated by the Legislature "shall be transferred to the Maryland Stadium Authority Financing Fund." Section 13–714.1 of the Financial Institutions Article requires Baltimore City to pay one million dollars annually into the Authority's Financing Fund "for the purposes of debt service and other forms of obligation by the Authority."

The bill also added new § 7–312 to the State Finance and Procurement Article for the purpose of creating a "Maryland Stadium Facilities Fund"—a "special, nonlapsing fund," to be "separately" held by the State Treasurer. It consisted of "moneys that may be appropriated, transferred, credited, or paid to it from any source." The section directs that the unspent balance of this Fund not revert to the General Fund of the State at the end of the fiscal year. Under § 7–312(E), receipts in the Facilities Fund are authorized to be used with certain approvals (1) to pay rent to the Maryland Stadium Authority and (2) to make grants or loans up to one million dollars to the Authority in any fiscal year and (3) to finance capital construction in lieu of issuing bonds.

Also included in the bill was new § 7–312(F) of the State Finance and Procurement Article; it requires, at the end of

the fiscal year, a transfer to the Dedicated Purpose Account of the State Reserve Fund of balances in the Facilities Fund in excess of 24 million dollars, plus the Debt Service Reserve Fund held for payment of debt service on the Authority's bonds. Revenues so transferred to the State Reserve Fund "are dedicated for use by the Maryland Stadium Authority and may be transferred from the State Reserve Fund by an appropriation in the Budget Bill or, with the approval of the Legislative Policy Committee by budget amendment." [1]

Finally, the bill added new provisions to the State Government Article requiring (1) that the State Lottery Agency conduct each fiscal year at least two, but not more than four, sports lotteries for the Authority's benefit, § 9–120.1, and (2) that the Comptroller pay into the Stadium Facilities Fund the net proceeds of these sports lotteries. § 9–120(b)(1)(I).

As shown by the Senate and House Journals, the three Maryland Stadium Authority bills were favorably reported, with amendments, by the fiscal committees of the General Assembly. An extensive report entitled "The Stadium Issue," prepared by the Legislature's Department of Fiscal Services, was available during consideration of the bills by the fiscal committees and ultimately by the entire membership of the General Assembly. Much of its content was included in the "Floor Report" of the Senate Budget and Taxation Committee relating to the financing of the sports

---

1. The State Reserve Fund, § 7–309 of the State Finance Article, is comprised of the Dedicated Purpose Account and the Revenue Stabilization Account. The Dedicated Purpose Account is a continuing, nonlapsing fund for the purpose of retaining appropriations for major, multi-year expenditures where the magnitude and timing of cash needs are uncertain; and to meet expenditure requirements which may be impacted by federal law or fiscal policies, or other similar contigency situations. § 7–310 of the State Finance Article.

Section 7–310(d) provides that appropriations to the Dedicated Purpose Account designated for a specific purpose, after notice to the Legislative Policy Committee, may be transferred by budget amendment to the expenditure account of the appropriate unit of State government.

facilities proposed by S.B. 847 (ch. 124). This report gave an overview of the bill's salient provisions, highlighting the fact that the bill permitted the Authority to issue 206 million dollars in mainly tax-exempt, 30-year lease backed revenue bonds. The report noted that the bill created three new revenue sources—the sports lotteries, estimated to produce 16.4 million dollars annually;[2] the one million dollar grant from Baltimore City; and operating revenues of the Authority estimated at 5.3 million dollars yearly—a total amount greater than the annual estimated debt service on the bonds of approximately 17 million dollars. The committee report indicated that these new revenue sources would permit the Legislature in the Budget Bill to appropriate annually, in the form of lease payments, the funds necessary to cover the debt service on the bonds. As otherwise stated in the report, site acquisition and construction costs for the sports facilities would be funded by 30-year Authority revenue bonds, with debt service financed by annual lease payments to the Authority from funds appropriated each year by the Legislature, and with the sports lotteries constituting the main source of revenues for the lease payment appropriations. *See* "The Stadium Issue," at 15.[3]

The economic benefit to the State of the new facilities was outlined in the committee report as follows: for the new baseball stadium, 132 million dollars annually in 1990

---

**2.** To yield 16.4 million dollars in net proceeds, the sports lotteries must gross 40 million dollars a year in revenues.

**3.** The purported advantages of this so-called lease backed financing were outlined at 14 of "The Stadium Issue," as follows:

"1. The financing enjoys the credit strength of the State without a direct State pledge of general obligation. Generally, the rating on such bonds will be one full grade below the State's general obligation and this would be equivalent to a AA or AA– rating.

2. Since annual apprpriations for lease payments cover the debt service exactly, revenue sources are not required to provide the coverage ratio sought by a rating agency for strictly a revenue bond issue.

3. Since such financing is not considered legal debt, there is no 15 year maximum maturity time period."

dollars; and 59.8 million dollars for the football stadium if an NFL franchise was obtained. The economic impact upon the City was estimated at 9.6 million dollars in new local taxes during the construction phases and 1.6 million annually generated by the sports facilities.

The three bills were enacted by the General Assembly and signed into law by the Governor on April 30, 1987 as chs. 122, 123, and 124 of the Acts of 1987; they took effect on June 1, 1987.

Because of the anticipated enactment of the bills, a General Fund appropriation included in the proposed annual Budget Bill for the Authority in the total amount of $521,-632 was stricken by the Legislature. *See* the Budget Bill, ch. 121 of the Acts of 1987, Item 37.01.24.14, at 153 and 225. The *Report of the Chairmen of the House Appropriations Committee and Senate Budget and Taxation Committee,* 1987 session, at 204, explains the reason for this action: "Delete general funds for agency in anticipation of special funds becoming available as part of a stadium financing plan. Gap financing should be provided through the General Emergency Fund if necessary." [4]

## II.

Opponents of the Stadium Authority enactments undertook to petition chs. 122 and 124 to referendum under Art. XVI of the Maryland Constitution. Acting through Marylanders for Sports Sanity (MASS), referendum petitions were presented to the Secretary of State on May 27 and 28,

---

4. The General Emergency Fund is annually appropriated in the Budget Bill to the Board of Public Works. *See* ch. 121 of the Acts of 1987, Item 23.05.01.02, appropriating the amount of 2 million dollars:

"(1) for supplementing appropriations made in the budget for Fiscal Year 1988 when the regular appropriations are insufficient for the operating expenses of the government beyond those that are contemplated at the time of the appropriation of the budget for this fiscal year or (2) for any other contingencies that might arise within the State or other governmental agencies during the fiscal year or any other purposes provided by law, when adequate provision for such contingencies or purposes has not been made in this budget."

1987. The Secretary refused to accept them in view of an opinion of the Attorney General of Maryland that neither Act was referable. *See* 72 Op. Att'y Gen. (1987).

MASS thereafter promptly filed suit in the Circuit Court for Anne Arundel County, seeking a writ of mandamus to compel the Secretary to accept the petitions and forward them to the State Administrative Board of Election Laws, as required by law. After the court granted a motion to intervene by the Greater Baltimore Committee (GBC), both the Secretary and GBC filed motions for summary judgment. They took the position that ch. 124 was a law making an "appropriation for maintaining the State Government" within the contemplation of the Referendum Amendment of the Maryland Constitution and thus was not referable. This was so, they contended, because ch. 124 mandates the raising of revenues to provide the financing for the continued operation of the Stadium Authority and for its site acquisition and construction of sports facilities at Camden Yards. Thus, they argued, ch. 124 was itself an "appropriation" within the meaning of the Referendum Amendment because it earmarked and dedicated monies for a particular purpose, even though ch. 124 did not directly authorize the disbursement of any budgeted funds. Moreover, they maintained that ch. 124 was enacted for the purpose of maintaining State government because the Authority could not otherwise perform its statutory duties of promoting the recreation of the public, a traditional and long-standing governmental function. And they also urged that the stadium "package" of bills, chs. 122, 123, and 124, must be read as a single legislative enactment. Because ch. 122—the so-called Site Act for the new proposed facility in Camden Yards—was legally inseparable from the financing mechanisms contained in ch. 124, the Secretary and GBC contended that the two bills must be considered as one for purposes of interpretation, construction, and legal effectiveness. They contended that because the two Acts were interdependent and treated a single subject, and because ch. 124 was a law making an "appropriation for maintaining the

State Government," neither ch. 122 nor ch. 124 was capable of referendum.

The contrary position taken by MASS in opposition to the summary judgment motions was adopted, for the most part, by the circuit court. In an opinion by Judge Raymond G. Thieme, Jr., it was first noted that there was no appropriation for the Authority contained in the Budget Bill. He observed that while ch. 124 created a comprehensive financing scheme to raise funds to acquire and construct sports facilities at the Camden Yards site, it did not itself disburse any funds. To come within the exception to the Referendum Amendment, the court said that the law must authorize a disbursement in a specific amount for the purpose of maintaining State government. After reviewing the provisions of Art. III, § 52 of the Maryland Constitution (the Budget Amendment), Judge Thieme concluded that the General Assembly could appropriate money out of the State Treasury only by the Budget Bill or by a Supplementary Appropriation Bill. Because ch. 124 concededly was not a supplementary appropriation bill, as it made no provision for a tax to raise the revenue, the court found that this enactment did not constitute an "appropriation" within the meaning of the Referendum Amendment. Judge Thieme said, after reviewing our cases, that "an appropriation includes both a revenue producing measure and a revenue disbursing measure ... [and that] the elements may be embodied in one act or in separate acts, one of which being a Budget Bill, and construed as one Act." The authority to issue and sell revenue bonds was not, he said, an "appropriation" and, in any event, was discretionary in ch. 124, not mandatory, and was subject to a number of preconditions. Moreover, Judge Thieme held that there was no provision in ch. 124 mandating that a sum certain be generated by the revenue bonds and disbursed to the Authority for the acquisition and construction of the facilities. As a consequence, he said that "[t]here is no withdrawal from the State Treasury of a certain sum of money for the purpose

of constructing the stadia through the revenue bond provisions."

Further in the opinion, Judge Thieme noted that the proposed lease payments for the Authority's facilities, the amount of which was not specified in ch. 124, were to be made by the State only on a permissive and contingent basis from future budget bills. He said that because the proceeds of the sports lottery, the Baltimore City contribution, and stadium revenues and grants had not been collected, any appropriation of State funds in ch. 124 was "illusory." He characterized ch. 124 as, at most, "a revenue raising measure of indefinite sums," and not an appropriation act. Nor is it, he held, *"in pari materia* with the Budget Bill (Fiscal Year 1988), as the Budget Bill contains no appropriation of funds for the Authority or for the acquisition and construction of sports stadia."

Judge Thieme furthermore concluded that Art. XVI "should be liberally construed in favor of the people" and that "limitations on the power of the referendum should be narrowly construed to ensure that the power is not subverted." In any event, the court repeated, ch. 124 was not a law for the purpose of maintaining State government within the Referendum Amendment. While finding that construction of stadiums for recreational purposes could constitute a primary function of State government, Judge Thieme further found that because ch. 124, by its preamble, required that private investment be maximized, and because lease backed financing was used rather than general obligation bonds pledging the full faith and credit of the State to payment of the Authority's bonds, the General Assembly intended that the stadium construction be undertaken primarily by private investment. And, finally, he held that ch. 122 did not constitute an appropriation for maintaining the State government, since it neither raised revenue nor appropriated funds, but simply authorized the Authority to acquire the Camden Yards site for the sports facilities.

Having determined that chs. 122 and 124 could be petitioned to referendum, the court held that MASS had a clear

legal right to have the petitions accepted by the Secretary of State and forwarded to the State Administrative Board of Election Laws. The court, therefore, granted MASS' request for a writ of mandamus and denied the Secretary's and GBC's motions for summary judgment. This appeal followed.[5]

### III.

The precise issues in this case are (1) whether ch. 124 is a law making an "appropriation" within the meaning of the Referendum Amendment; (2) if it is such a law, whether the "appropriation" made by ch. 124 is for "maintaining the State Government" within the contemplation of Art. XVI and thus exempt from the referendum, and (3) whether ch. 122, which concededly makes no appropriation, is nevertheless part of an interdependent and legally inseparable package of legislation with chs. 123 and 124 and thus is nonreferable under Article XVI.

### (A)

The Referendum Amendment to the Maryland Constitution was proposed by ch. 673 of the Acts of 1914 and was ratified on November 2, 1915. It was "the brainchild of Populist and Progressive Movements which dominated national politics in the late nineteenth and early twentieth centuries" and was enacted in response "to the public outcry over corruption in state government and alleged abuses of legislative power." *Ritchmount Partnership v. Board,* 283 Md. 48, 60, n. 9 and 10, 388 A.2d 523 (1978).[6] Shortly after the Amendment's enactment, we said that its

---

5. We granted certiori prior to consideration of the appeal by the intermediate appellate court to consider, as expeditiously as possible, the significant issue of public importance involved in the case.

6. In its initial form, ch. 673 proposed both the initiative and the referendum. The initiative provisions encountered stiff opposition in the General Assembly and were deleted from the Act. *See Baltimore Sun,* March 20, 1914, at 2, col. 5; April 5, 1914, at 4, col. 7; *See* C. Everstine, *The General Assembly of Maryland,* 1850–1920, 566 (1984).

meaning and limitations must be determined "in the light of its origin, the purpose it was intended to serve, as well as the evils it was intended or supposed to remedy." *Beall v. State*, 131 Md. 669, 676, 103 A.2d 99 (1917). In this connection, we there noted that since the establishment of Maryland's first Constitution in 1776, our people "had lived under a well recognized form of representative self-government ... [which was] for many years looked upon as one of the great principles of popular government, and as necessary and indispensable for the preservation of civil order and popular liberty." *Id.* at 677, 103 A.2d 99. We observed, however, that after the close of the Civil War, and in particular between the years 1880 and 1900, "great abuses began to creep into legislation and into the administration of the National and State governments." *Id.* These abuses were said "to have grown out of the control by corrupt methods of legislation and administration by great corporations and a group of individuals in each State who had taken into their hands the machinery of each of the great political parties." *Id.* As a result, "it was charged that the government, in all its departments, was prostituted to corrupt and selfish purposes." *Id.* The Referendum Amendment was thus "designed as a modification of, or as a supplement to the principle of representation ... [to] prevent the reoccurrence of many of [these] abuses." *Id.* at 678, 103 A.2d 99.[7] Therefore, upon the timely filing of a valid referendum

---

7. The inclusion of referendum and initiative provisions in state constitutions began in South Dakota in 1898. These provisions were viewed as a means to curb legislative power, increase the direct involvement of citizens in government, and check the power exerted by special interest groups. *See generally* Lapalombara & Hagan, *Direct Legislation: An Appraisal and A Suggestion*, 45 Am.Pol.Sci.Rev. 400 (1951); Lowe, *Public Safety Legislation and the Referendum Power: A Reexamination*, 37 Hastings L.J. 591, 591–93, 600–01 (1986); Comment, *The Current Use of the Initiative and Referendum in Ohio and Other States*, 53 U. Cinn.L.Rev. 541, 544–45 (1984); E. Oberholtzer, *The Referendum in America* 426 (3d ed. 1971). Twenty-six states now have some provision for direct legislation. Twenty-one allow both initiative and referendum; three referendum only, and two initiative only. Eighteen of these states limit the subject matter of such direct legislation. D. Magleby, *Direct Legislation* 36 (1984).

petition, the referred statute (other than an emergency measure) "shall not become a law or take effect until thirty days after its approval" by majority vote at the next ensuing statewide general election.

At the time of the Referendum proposal in 1914 and its adoption in 1915, bills for the expenditure of public monies for the State's governmental purposes were initiated solely by the Legislature. Then, as now, Art. III, § 32 of the Maryland Constitution prohibited the withdrawal of any money "from the Treasury of the State ... except in accordance with an appropriation by Law." [8] And § 34 of Article III of the Constitution then provided (as now) that no "debt" could be contracted by the General Assembly for purposes of financing governmental projects "unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same...."

The Budget Amendment to the Maryland Constitution, Art. III, § 52, which introduced a comprehensive executive budget system in this State, and required that "[e]very appropriation bill shall be either a Budget Bill, or a Supplementary Appropriation Bill," was not in effect at the time of the Referendum's adoption. Consequently, we look to the history of legislatively authorized expenditures, prior to the adoption of the Budget Amendment, to ascertain the intended reach of the limitation in Art. XVI excepting from its provisions a law making an "appropriation for maintaining the State Government."

---

**8.** Section 32 also required every appropriation measure to "distinctly specify the sum appropriated, and the object, to which it shall be applied; provided, that nothing herein contained, shall prevent the General Assembly from placing a contingent fund at the disposal of the Executive, who shall report to the General Assembly, at each Session, the amount expended, and the purposes to which it was applied."

Maryland had no orderly system of planned public expenditures in the years before the Budget Amendment. *See* C. Everstine, *The General Assembly of Maryland, 1850–1920,* at 571 (1984). During that period, appropriations for various purposes were made piecemeal by a series of bills enacted by the General Assembly, each project receiving independent consideration without relation to other claims upon the public purse. *McKeldin v. Steedman,* 203 Md. 89, 96, 98 A.2d 561 (1953). As a result of these uncoordinated multiple appropriations, many for State-aided charitable institutions, deficits in the State Treasury were not unusual; the problem was exacerbated by the Legislature's practice of making "continuing appropriations," *i.e.,* those for specific purposes which would go on indefinitely without further legislation. *See Md. Act. for Foster Child. v. State,* 279 Md. 133, 367 A.2d 491 (1977); *Panitz v. Comptroller,* 247 Md. 501, 232 A.2d 891 (1967); *Baltimore v. O'Conor,* 147 Md. 639, 128 A. 759 (1925). As the power to expend public monies was vested solely in the Legislature, it was free to ignore the Governor's recommendations in making public expenditures. Numerous spending bills were enacted by the Legislature, with individual members representing districts, seeking funds for particular purposes on behalf of their constituencies. No effective provision then existed in the State's system of financing the government for the presentation to the Legislature of a complete picture of the financial condition and needs of the government. And, it was said, the stream of appropriation bills was withheld until the last few days of the legislative session when deliberate scrutiny of their provisions was not possible; indeed, they were frequently decided upon in the privacy of committee rooms, and were the product of "log-rolling" between members of the legislature, senatorial or delegate courtesy as to the passage of such bills being prevalent among the legislators. These accounts of the

dismal fiscal practices of the General Assembly prior to the Budget Amendment are well documented.[9]

The Referendum Amendment, with its exemption of laws making appropriations for maintaining the State government, thus bears examination in light of this historical background. Whether the General Assembly, in proposing the exceptions to the people's right to Referendum, was undertaking to insulate its interest in spending public monies, or had some higher purpose in mind cannot be gleaned from the literature on the subject. In substance, however, it seems clear that the Referendum Amendment excluded from its coverage all those bills, with or without revenue-raising provisions, which authorized the expenditure of public money to maintain the State government, and other such bills which appropriated sums "for maintaining or aiding any public institution" not exceeding "the next previous appropriation for the same purpose."[10]

The Budget Amendment, ratified in 1916, corrected many of the fiscal deficiencies which existed at that time by providing for a comprehensive executive budget system for the State. This system required that the Governor present a complete and balanced plan of proposed appropriations and estimated revenues for the fiscal year to the Legislature in the form of a Budget Bill. The provisions of the Budget Amendment and its history have been reviewed in great detail in a number of our cases and require no

---

**9.** *See, e.g.,* H. Miles, *The Maryland Executive Budget System,* at 8–10 (1942); E. Harrington, *The First State Executive Budget,* 8 Proceedings of the Academy of Political Science, at 18–19, 25 (1920); *Municipal Research* (Vol. 73), at 30 (1916); F. Goodnow, Chairman of the Goodnow Commission, *Address to the Twenty-second Annual Meeting of the Maryland State Bar Association* (1917); *Address to the General Assembly of Maryland* (Governor Crothers), Senate Journal of Proceedings, at 40–41 (Jan. 3, 1912); *Goodnow Commission Report,* Senate Journal of Proceedings, at 129–34 (Jan. 28, 1916); H. Flack, *The Maryland Budget Amendment* (1917).

**10.** Among such bills were those creating a constitutional debt under § 34 of Art. III of the Constitution through the issuance of State bonds to raise revenues for various capital projects of the State or State-aided public institutions. *See, e.g.,* ch. 200, Acts of 1902; ch. 228, Acts of 1904; ch. 749, Acts of 1912; ch. 791, Acts of 1914.

repetition here. *See, e.g., Md. Act. for Foster Child. v. State, supra; McKeldin v. Steedman, supra; Dorsey v. Petrott,* 178 Md. 230, 13 A.2d 630 (1940); *Baltimore v. O'Conor, supra.* Especially to be noted, however, is that the Budget Amendment specified in § 52(1) and (2) that the General Assembly "shall not appropriate any money out of the Treasury" except by either "a Budget Bill or a Supplementary Appropriation Bill." The latter, as defined in paragraph (8) of § 52, was a legislatively initiated appropriation measure "embodied in a separate bill limited to some single work, object or purpose therein stated" and required to "provide the revenue necessary to pay the appropriation thereby made by a tax, direct, or indirect, to be levied and collected as shall be directed in said bill."

Without question, within the meaning of the Referendum Amendment, an "appropriation for maintaining the State Government" may be included within a Budget Bill or supplementary appropriation bill. *See Bayne v. Secretary of State,* 283 Md. 560, 392 A.2d 67 (1978); *Winebrenner v. Salmon,* 155 Md. 563, 142 A. 723 (1928). Since ch. 124 is neither a Budget Bill nor a supplementary appropriation bill under the Budget Amendment, we consider whether it is nevertheless a bill within that class of money bills or spending measures contemplated by the exceptions to the referendum right under Art. XVI.

In a 1927 opinion, then Attorney General Robinson considered whether a statute which increased the gas tax and dedicated the proceeds for highway construction and maintenance was a law making an appropriation "for maintaining the State Government" and thus was not referable under Art. XVI. 12 Op. Att'y Gen. 228. In determining for referendum purposes "what constitutes a law making an appropriation," the Attorney General took cognizance of the "radical change" effected by the Budget Amendment to the Maryland Constitution. *Id.* at 233. He noted that under the Budget Amendment, unlike the situation prior to its adoption, all disbursements of State revenues are made by

either a budget bill or by supplementary appropriation bills. *Id.* at 234.

After discussing the intricacies of the Budget Amendment, the Attorney General stated that "[w]ithin the meaning of Art. XVI at the time of its adoption, [the statute sought to be referred] is unquestionably an appropriation measure," as it imposed a tax from which the revenue required for road construction was to be derived. *Id.* at 234. But, he said, "the word 'appropriation' is not used in the same sense in the budget amendment and in Article XVI." *Id.* at 235. As to the exception in the Referendum Amendment, the word "appropriation ... signifies the act of setting apart or assigning to a particular use or person in exclusion of all other, that is to say, the application to a special use or purpose"; whereas in the Budget Amendment the word "appropriation" denotes "disbursement ... of appropriated monies from the State Treasury." *Id.* at 235. Attorney General Robinson said:

> "The Budget amendment prescribes the method whereby appropriated funds may be withdrawn from the State Treasury. Article XVI refers to all laws assigning public monies to a particular use or purpose, regardless of whether such law is adequate or legally sufficient to authorize the payment or disbursement of the appropriated monies." *Id.*

Thus, whether the statute sought to be referred "is regarded as separate and distinct from the budget bill or is considered in connection therewith, it must be held to be a law making an appropriation, within the meaning of Article XVI." *Id.*

Finding that the appropriation was one for maintaining the State government, the opinion indicated that the framers of Art. XVI "had in mind that if laws making appropriations for maintaining the State government were subject to referendum, it would be possible, through the exercise of this power by the people, to cause the State serious financial embarrassment in the performance of its various essential functions." *Id.* at 235–36. The opinion concluded that

"the broad language of the exception was intended to include all laws providing revenue for and/or appropriating monies to any organized department of the State ... [for] the exercise of State functions." *Id.* at 236.

Notwithstanding the Attorney General's opinion as to the nonreferability of the statute, the matter was ultimately challenged in *Winebrenner v. Salmon,* 155 Md. 563, 142 A. 723 (1928). We there said that the statute, although technically not valid as a supplementary appropriation bill because it was enacted prior to the Budget Bill, nevertheless constituted an "appropriation" under Art. XVI for maintaining the State government, which could not be referred to Referendum. In so holding, we noted that even though the statute might not for that reason be "sufficient in itself to authorize the withdrawal [of money] from the treasury of the State ... it was at least a direction to the Governor to make the disbursement in the budget to be prepared by him." *Id.* at 567, 142 A. 723. We concluded that the statute and the Budget Bill were *in pari materia* and must be construed together as though they constituted one act. *Id.* at 567, 142 A. 723.

*Dorsey v. Petrott,* 178 Md. 230, 13 A.2d 630 (1940) involved the referability of a statute dealing with the conservation of fisheries in tidewater, Maryland, said by the Court to be an imperative function of government. The issue was whether the statute constituted a law making an appropriation within the meaning of the Referendum Amendment "when construed in connection with other related provisions of the Constitution." 178 Md. at 235, 13 A.2d 630. We there said that "a law making an appropriation," in legislative and constitutional history, "has had a definite significance." *Id.* at 236, 13 A.2d 630. Reviewing the Maryland Constitution of 1776, we observed that only the House of Delegates was empowered "to originate money bills." *Id.* As to the meaning of a "money bill," the Court said it "embraces bills providing for the raising of public revenue and for the making of grants or appropriations of public money in the Treasury." *Id.* As to subsequent Maryland

Constitutions, which involved "money bills" originating in either chamber of the General Assembly, we referred to *McPherson v. Leonard,* 29 Md. 377 (1968). In that case, we stated that the constitutional requirement of Art. III, § 32 that no money be drawn from the Treasury except by an appropriation by law was satisfied by a statute that directed that the warrant of the Comptroller be paid from "any money thereafter in the treasury not otherwise appropriated." *Id.* 178 Md. at 238, 13 A.2d 630. This, we said, was "certainly an appropriation, and a fund is dedicated to its payment." *Id.* at 238–39, 13 A.2d 630.

Next discussed in the opinion were appropriations "by constitutional mandate" (citing the School Fund under § 3 of Art. VIII of the Maryland Constitution and the payment of debt service on State debts contracted under § 34 of Art. III of the Constitution). As to these, we found it

"evident that the Referendum Amendment did not mean to include within the purview of its operation a statute to raise revenues for these specific purposes by a levy of taxes or by the imposition of other fiscal measures. The act for these purposes and the moneys so procured are, therefore, an act and a fund for the maintenance of the State Government; and, so, the act is excepted from the Referendum Amendment." *Id.* at 240, 13 A.2d 640.

Continuing, the Court said that no basis existed "for the construction that a law imposing or providing for a tax levy or other means of raising revenue for the maintenance of the state government is a law referable to the electorate . . . [within] the terms of the Referendum Amendment." *Id.* The Court next said that "[t]he determinative characteristics of an appropriation for maintaining the State Government at the time of the adoption of the Referendum Amendment in 1915 were not fundamentally affected by the Budget Amendment." *Id.* at 241, 13 A.2d 640.

Following an extended recitation of the provisions of the Budget Amendment, we recognized that "the budget bill itself does not provide the means for the raising of the revenue requisite for the payment of the appropriations

made ... [but] is to be implemented by the passage of such money bills or revenue measures as shall produce and supply the moneys necessary for the Treasury to meet the appropriations made by the budget bills." Id. at 243, 13 A.2d 640. It follows, we said, "that revenue measures to raise the public funds to pay the appropriations of the Budget Bill are excepted from the operation of the Referendum Amendment, although the revenue thus procured is disbursed by the Treasury through the provisions of the budget without any express authorization in the money bill for its disbursement." *Id.* at 244, 13 A.2d 640. The Court then concluded that "an appropriation of public funds is made by a constitutional mandate or a lawful legislative act whose primary object is to authorize the withdrawal from the state treasury of a certain sum of money for a specified public object or purpose to which such sum is to be applied." *Id.* at 245, 13 A.2d 640. We found, however, that the statute involved in the case was only a general law and not an appropriation measure. We cautioned that such a law could not "be converted into an appropriation bill merely because there may be an incidental provision for an appropriation of public funds." *Id.* at 251, 13 A.2d 640.

*Dorsey v. Petrott* in large part echoes the conclusions reached thirteen years earlier by Attorney General Robinson in his 1927 opinion. Thus, whether the provisions of ch. 124 are effective to make an "appropriation" to the Authority in the context of the Budget Amendment's provisions is not here in issue. For, as *Dorsey* makes clear, when considering the meaning of an "appropriation" for purposes of the Referendum Amendment, nothing in that Amendment was "fundamentally affected" by the later enactment of the Budget Amendment. 178 Md. at 241, 13 A.2d 640. To the same effect, *see Bayne v. Secretary of State,* 283 Md. 560, 392 A.2d 67 (1978).

As earlier indicated, ch. 124 authorizes a State instrumentality, the Maryland Stadium Authority, to borrow funds through the issuance of its bonds, the proceeds to be deposited in its Financing Fund, a special revolving fund

account not within the State Treasury.[11] The Authority is authorized by ch. 124 to forthwith expend these dedicated funds for site acquisition and Stadium construction. Chapter 124 also directs the deposit of other funds in the Authority's Financing Fund, including monies received to meet the debt service requirements on the Authority's bonds from (1) annual appropriations directed to be included in the Budget Bill in the form of lease payments to the Authority from the State; (2) funds directed to be paid by the City of Baltimore in the amount of one million dollars annually, and (3) the Authority's operating revenues. The creation of a Stadium Facilities Fund within the State Treasury is also mandated by ch. 124, this being the depository for the net proceeds realized from the sports lotteries (these monies being the revenue source enabling the State to make its annual appropriation to the Authority's Financing Fund for debt service purposes). If and when the amount of money in the Stadium Facilities Fund exceeds 24 million dollars, plus the debt service reserve fund, ch. 124 directs that the excess shall be transferred to a dedicated reserve fund and held for the Authority's credit in furtherance of its corporate purposes.

■ Chapter 124 is, therefore, a finely tuned law containing an intricate financing mechanism to permit the State to receive and expend public monies required to obtain a site and to construct the contemplated sports facilities in the public interest. Specifically, it authorizes the borrowing of funds through the issuance of bonds, the disbursement of those funds through the Authority's Financing Fund, and the payment of the Authority's bonded indebtedness

---

**11.** Under § 6–213 of the State Finance Article (formerly § 198 of Art. 41 of the Maryland Code), a State instrumentality like the Authority may be exempted by statute from depositing its receipts in the State Treasury. As to the Authority's Financing Fund, it is so exempted by ch. 124. The constitutional powers vested in the Comptroller and in the State Treasurer are not contravened by such a statute. As to the Comptroller, see § 2 of Art. VI; as to the State Treasurer, see § 3 of Art. VI.

through monies directed to be paid by the State to the Authority through annual appropriations in the Budget Bill, by the City of Baltimore, and through the Authority's own revenues included in its Financing Fund. Simply because no funds were appropriated to the Authority through the Budget Bill which was enacted in the same year as ch. 124 does not convert ch. 124 into other than 'a law making an "appropriation" within the broader meaning of that term as contemplated by the Referendum Amendment. In other words, ch. 124 is a type of revenue raising and spending measure intended to be embraced within the exclusionary provisions contained in the Referendum Amendment.

In so concluding, we have considered whether, as held by Judge Thieme, the people's right to referendum under Art. XVI should be broadly construed and, conversely, the exception to that right narrowly construed. The contrary argument is made by the Secretary and GBC, upon authorities presented, that it is the exception, rather than the right, which in light of its purpose should be broadly interpreted. Neither of these arguments is, of course, controlling of the ultimate construction of the meaning of the Referendum Amendment's excepted provisions. Our interpretation, as herein expressed, is in accord with the obvious purpose of the exception to insulate revenue raising and spending measures from suspension under Art. XVI's provisions.[12]

### (B)

The Secretary and GBC argue that the appropriation of funds under ch. 124, within the contemplation of the Referendum Amendment, was for the purpose of "maintaining

---

12. In view of our holding, we need not address the elaborate arguments presented by the Secretary and GBC that the State's invocation of the statutorily authorized budget amendment process in § 7.201 *et seq.* of the State Finance Article, as fortified by various sections contained within the Budget Bill itself—both assertedly authorized by the Budget Amendment in § 52(13)—effectuated an "appropriation" of funds to the Authority by authorized budget transfer in the present fiscal year.

the State Government" and consequently the trial court erred in reaching a contrary conclusion.

■ It is well settled in Maryland that government, state or local, acts pursuant to a valid public purpose when it provides parks or sports facilities, including stadiums, for public recreational activities. *See Reyes v. Prince George's County*, 281 Md. 279, 381 A.2d 12 (1977) (sports arena); *Pressman v. D'Alesandro*, 193 Md. 672, 69 A.2d 453 (1949) (Baltimore Stadium); *Green v. Garrett*, 192 Md. 52, 63 A.2d 326 (1949) (a valid public purpose exists in permitting use of Baltimore Stadium for professional baseball).[13] Other jurisdictions are well in accord.[14] Indeed, the State's authorization for the financial support of stadium facilities for professional sports in furtherance of public recreational activities is of long standing.[15] In addition to Maryland's financial support for the Baltimore's Memorial Stadium and public ownership of the Cleveland and New Jersey Meadowlands stadiums, the Pittsburg Stadium Authority owns

---

**13.** Cases finding the provision of parks for public recreational activities to constitute a valid governmental purpose include *Baltimore v. State*, 173 Md. 267, 195 A. 571 (1937); *Baltimore v. State*, 168 Md. 619, 179 A. 169 (1935).

**14.** *See, e.g., Todd v. McCloy*, 196 Ark. 832, 120 S.W.2d 160 (1938); *City of Oakland v. Oakland Raiders*, 32 Cal.3d 60, 183 Cal.Rptr. 673, 646 P.2d 835 (1982); *City of Anaheim v. Michel*, 259 Cal.App.2d 835, 66 Cal.Rptr. 543 (Cal.App.1968); *Ginsberg v. City and County of Denver*, 164 Col. 572, 436 P.2d 685 (1968); *Alan v. County of Wayne*, 388 Mich. 210, 200 N.W.2d 628 (1972); *New Jersey Sports & Exposition Auth. v. McCrane*, 119 N.J.Super. 457, 292 A.2d 580 (1971), *aff'd* 61 N.J. 1, 292 A.2d 545 (1972); *Bazell v. City of Cincinnati*, 13 Ohio St.2d 63, 233 N.E.2d 864 (1968); *Meyer v. City of Cleveland*, 35 Ohio.App. 20, 171 N.E. 606 (1930); *Martin v. City of Philadelphia*, 420 Pa. 14, 215 A.2d 894 (1966); *Cathcart v. City of Columbia*, 170 S.C. 362, 170 S.E. 435 (1933). *See also Opinion of the Justices*, 356 Mass. 775, 250 N.E.2d 547 (1969).

**15.** The State has authorized the expenditure of over 40 million dollars in public funds for construction on the Baltimore Stadium. *See* ch. 97, Acts of 1947; ch. 17, Acts of 1947, Special Session; ch. 425, Acts of 1971; ch. 816, Acts of 1975; ch. 691, Acts of 1976; ch. 934, Acts of 1978; ch. 542, Acts of 1979; chs. 707 and 120, Acts of 1980; ch. 457, Acts of 1981; ch. 662, Acts of 1982.

Three Rivers Stadium; the Metropolitan Council Sports Facilities Commission owns the Metrodome; the Louisiana Stadium & Exposition District owns the Louisiana Superdome; the Tampa Sports Authority owns Tampa Stadium; the City of Irving owns Texas Stadium; the Pontiac Stadium Authority owns Pontiac Silverdome; the Jackson County (Mo.) Sports Complex Authority owns both Royals Stadium and Arrowhead Stadium; the City of Philadelphia owns Veterans Stadium; King County (Wash.) owns the Kingdome; the City of Atlanta and the Fulton County Recreation Authority own The Omni; and the City of Philadelphia owns the Spectrum. Maryland Special Advisory Commission on Professional Sports and the Economy, *Professional Sports Arena Plan, Final Report,* 143–48 (September 1985).

Even though the expenditure of public funds for the construction of a stadium for professional football and baseball constitutes a valid public purpose, the real question is whether the State's involvement through ch. 124 in this enterprise is within the meaning of Art. XVI's exception of an appropriation "for maintaining the State Government." Our cases lead us to the conclusion that ch. 124 does constitute a law making an appropriation for this purpose.

As already observed, *Winebrenner v. Salmon,* 155 Md. 563, 142 A. 723 (1928), involved a statute in which the proceeds of an increased tax on gasoline were dedicated to the creation of a special fund to be applied to road construction and maintenance. In determining whether this appropriation was for maintaining the State Government, *Winebrenner* recognized that the purpose of the exception in Art. XVI "was to provide against the possibility of the government being embarrassed in the performance of its various functions." 155 Md. at 568, 142 A. 723. Appropriations for maintaining the State Government, it said, "included more than merely those which provide overhead expenses, such as salaries and expenses incidental to keeping the government afloat as a going concern." *Id.* The Court said that the government "includes all its agencies" and

that maintaining the government "means providing money to enable it to perform the duties which it is required by law to perform." *Id.* Noting the importance of the State agency there involved (the State Roads Commission) in the construction and maintenance of highways, we characterized the agency's function as "a primary function of government" and said that the appropriation there made was for maintaining the State government. In so concluding, we said that a law would not be within the referendum exception "merely because it carried an appropriation to an agency of the government, if it *created* an entire new function not theretofore recognized as coming within the sphere of governmental activity." *Id.* at 568, 142 A. 723 (emphasis in original). We found, however, that the appropriation was not for a new function as the agency had been involved in road construction and maintenance work for many years prior to the statute's enactment.

*Bickel v. Nice,* 173 Md. 1, 192 A. 777 (1937) involved a supplementary appropriation bill for the purpose of building a new state office Building. Citing *Winebrenner,* the Court said that housing for state officers and employees "would seem to be as much a primary function of government as building lateral roads, and equally entitled to be classed as maintaining the government." 173 Md. at 10, 192 A. 777. It noted that "the actuating purpose of the excepting clause [in the Referendum Amendment] was to prevent interruptions of government" and that the test thereby intended was "not the need of the appropriation or the project to carry out that purpose, but the design." *Id.* Thus, it said if the appropriation was "designed for maintaining the government and the project stated is of a kind that may be within that classification of maintaining the State Government, it is excepted." *Id.* It thus emphasized that the degree of need for the project was not the test; rather, the test was whether the project "was an activity within the class of those for maintaining the government, without reference to the existing need or lack of it." *Id.* at 11, 192 A. 777. "Final power and responsibility for the

decision on the need and usefulness of the building must rest with the General Assembly," the courts having no power to consider the wisdom of the enactment. *Id.* at 11, 192 A. 777.

More recently, in *Bayne v. Secretary of State*, 283 Md. 560, 392 A.2d 67 (1978), we had to determine whether restrictions on an appropriation in the Budget Bill for funding abortions for indigent women were for maintaining the State government. *Id.* at 570, 392 A.2d 67. We first recognized that "the preservation of the health of the inhabitants is one of the chief purposes of government," that relief of indigent persons is a governmental function, and that "the provision of medical services for indigent persons is a primary function of government." *Id.* at 570–71, 392 A.2d 67. We held that the appropriation was one for maintaining the State government under *Winebrenner* and *Bickel.* We characterized the government agency there involved (the Department of Health and Mental Hygiene) as "one of the more important agencies of the State." *Id.* at 572, 392 A.2d 67. We also recognized that the State had provided health services for indigent persons for more than thirty years and that the appropriation was not, therefore, for a new function. *Id.* at 572–73, 392 A.2d 67. Finally, we refused to question the Legislature's wisdom in designing the medical assistance program and determining the method of paying for it. *Id.* at 573, 392 A.2d 67. *See also Budget and Referendum Amendments,* 39 Md.L.Rev. 558 (1980).

While believing that construction of stadiums for recreational purposes could in some instances constitute a primary function of State government, Judge Thieme found no such purpose in the provisions of ch. 124. This was so, he reasoned, because of the General Assembly's declared preference for constructing the sports facilities through private investment, coupled with the fact that the State did not itself incur a constitutional debt under § 34 of Art. III of

the Constitution.[16] In addition to these reasons for declaring ch. 124 not to be a law making an appropriation for the maintenance of State government, the appellees urge that the State's broad involvement with athletic facilities and recreational activities does not elevate legislation thereto relating to the status of a primary function of State government. That sports facilities, including stadiums, may serve a public purpose is not of itself, they claim, sufficient to make the law one for the maintenance of the State government under the rationale of Art. XVI.

In determining whether a particular appropriation is for maintaining the State government within the meaning of the Referendum Amendment, our cases have variously described the appropriation as being for a "primary," "imperative," or "important" function of State government. While the facts in those cases readily permitted such a particularized characterization of the function performed by the State agency involved, we did not thereby intend to elevate any of those adjectival terms to the status of a governing test. As we have already seen, *Bickel v. Nice, supra,* 173 Md. at 10–11, 192 A. 777 sets forth the controlling considerations for ascertaining whether the appropriation is one for maintaining the State government. Our concern then, as now, was with the *design* of the appropriation, not its need or usefulness, so that if the authorized expenditure is "of a kind that may be within that classification [maintaining the State government]," it is not subject to referendum under Art. XVI. *Id.* As otherwise stated in *Bickel,* the proper test is whether the governmental activity being funded comes "within the class of those for maintaining the government, without reference to the existing need or lack of it." *Id.* at 11, 192 A. 777.

---

**16.** According to the Attorney General, the first issuance of the Authority's bonds will be in January of 1988; they will signify that the credit of the State is not pledged to their repayment. At least one sports lottery has already been conducted and the proceeds presumably deposited in the State Treasury to the credit of the Stadium Facilities Fund.

As a State instrumentality, the Authority is statutorily charged with the responsibility for considering the construction and operation of sports facilities for professional baseball and football. That this mission is in furtherance of public recreational purposes, and is a legitimate governmental objective of long duration, is not contested. The legislative determination to construct these facilities is manifestly not a function of government newly created with the enactment of ch. 124,[17] nor is it an undertaking for that purpose which is beyond the classification of an activity designed for the maintenance of State government.

Indeed, the very magnitude of the project approved by the Legislature in enacting ch. 124 plainly indicates its fundamental governmental purpose; it was one of the most ambitious revenue producing and spending measures enacted at the 1987 legislative session. The imaginative manner in which the Legislature chose to underwrite the enterprise was its business; the constitutionality of the method is not challenged.

It is true that the General Assembly expressed a preference to maximize private investment in the project, and to minimize the use of state lottery revenues. But this preference was not intended, as we read ch. 124, to partially or totally inhibit or forestall public involvement where that course of action becomes essential. In this regard, it is implicit in ch. 124, with its intricate public financing mechanism, that the Legislature recognized the certainty of the need for public participation since the project was of a type, and of such financial proportions, as unlikely to attract much in the way of private entrepreneurship. Notwithstanding the provision for private investment, and that the State's credit was not pledged to the discharge of the contemplated bonded indebtedness, we think the appropriation here involved fully satisfies the *Bickel* test. Article XVI requires only that the appropriation be one for main-

---

17. We have no reason in this case to consider the continuing viability of the "new function" of government test.

taining the State government, and we will not second-guess the legislative determination that it was so designed to achieve that end. Whether the stadium project is of more or less fundamental importance than other governmental expenditures is not for the courts to decide.

## IV.

We next consider whether ch. 122—the law designating Camden Yards as the stadium site—while itself making no appropriation for maintaining the State government, is nevertheless not subject to referendum vote under Art. XVI.

▮ The Secretary and GBC, analogizing to statutory interpretation, contend that the three stadium bills—chs. 122, 123, and 124—would be considered as one bill—not severable—for purposes of interpretation, construction and effectiveness. Relying upon Sutherland, *Statutory Construction*, § 44.02 at 482 (4th ed. 1986), they say that the "package" of stadium bills comprises a legislative program, involving related and interacting provisions which, although embodied in three associated bills, are nevertheless legally inseparable. For purposes of the exceptions in the Referendum Amendment, it is maintained that no reason exists to treat legally inseparable parts of a unified legislative package differently than the several parts of a single bill. It is further argued that since no part of ch. 124 is referable (as we have held), then no part of a single unified legislative program, although contained in separate bills, is subject to referendum. It is claimed that if legally inseparable bills were considered separately for purposes of applying the "appropriation" exclusion in the Referendum Amendment, the effect would be the direct suspension of an otherwise nonreferable bill (ch. 124) by reason of the direct referral of another bill in the package (ch. 122).

Taking the contrary position, the appellees argue that chs. 122 and 124, although of related subject matter, are legally distinct and separate bills. They say that in the

event that ch. 124 is found exempt from referendum, Maryland voters should not be deprived of the right to vote on ch. 122, which is only a general law authorizing the location of the stadiums. In furtherance of their argument, appellees point to the affidavits in the record of Senators Cade and Lapides, each to the effect that the General Assembly intended that ch. 122 be considered separately from ch. 124. Proof of this intention, appellees claim, is found in the fact that the 1987 stadium bills were developed and presented as three distinct measures, unlike predecessor legislation on the same subject, which had been introduced at earlier sessions through a single bill. According to appellees, this reveals a manifest intention by the Legislature to "use more than one bill in order to treat each facet of the stadium legislation as a distinct entity which could survive the defeat of the others."

Appellees focus on the fact that the Legislature made passage of ch. 123 expressly contingent upon the enactment of ch. 122, while no such "tie-bar" was provided between chs. 122 and 124. Appellees say that to apply a "uniform package theory," by which no part of a set of related bills could be submitted to referendum, is to render meaningless the provisions of the Referendum Amendment which allow the public to vote on "part of any act." Appellees urge that the defeat of ch. 122 at the polls would not scuttle the entire stadium project, *albeit* additional legislation to select a new site may be required.

That the three stadium bills were introduced and considered by the Legislature as a single "package" of bills is well supported by the record. Senate bills 228, 230 and 847 (later chs. 122, 123, and 124, respectively) were referred to the Finance and Budget and Taxation committees of the Senate for joint consideration and favorably reported with amendments on March 27. Senate Journal, 2019–2021, 2024. On March 30, following debate, the Senate bills were adopted and were passed on second reader. *Id.* at 2043–49; 2066–75. On April 1, after a cloture vote on a motion to limit debate on all three measures, the bills passed the

Senate and were sent to the House of Delegates. *Id.* at 2236–37. On April 2 the Ways and Means Committee of the House, to which the Senate bills were referred, reported the bills favorably and they passed on second reader. House Journal 2381–82. They passed third reader in the House on April 3, *id.* at 2450, and were returned passed to the Senate on April 6. Senate Journal at 2484.

The Director of the Department of Fiscal Services of the General Assembly, William S. Ratchford, II, in an affidavit included in the record, states that the three bills were treated in each house as a unit or package. He said:

> "The committees held briefings on the bills and the consultant's reports relating to the stadium issue. At public hearings, witnesses were permitted to discuss any or all parts of any or all the bills. In the Senate, the staffs of the two committees continually exchanged information and proposed amendments so each committee would be fully cognizant as to all facets of the stadium legislation, irrespective as to which committee was the "lead" committee on the Senate bills. When committee action in the Senate was undertaken, a special joint meeting of the two committees was held and the two committees voted on amendments to the bills and favorably reported the bills as amended at a single continuous sitting. In the Ways and Means Committee, the stadium issue was discussed and considered as a single subject and those bills that passed the Senate were considered as a package at the voting session. When the committee reports on the bills went to the floors of the respective houses, the bills were considered together although, by virtue of both the requirements of the Constitution and the rules of the houses, each was voted upon separately and in the order of its designated bill number; and when a filibuster was undertaken on the floor of the Senate, the filibuster was

treated by the President, as presiding officer, and by the members as relating to all three bills." [18]

As earlier observed, the detailed Report of the General Assembly's Department of Fiscal Services entitled "The Stadium Issue," prepared in March of 1987, outlined the background history underlying the proposals presented by the stadium bills. The Report stated that the Authority's purpose to acquire, construct, and operate facilities for professional baseball and football had two objectives: (1) to insure that the Baltimore Orioles baseball franchise remained in Baltimore under a long-term lease, and (2) to give the State the best possible chance to regain a National Football League (NFL) franchise upon expansion of the league. Report, at 1. It pointed out that the Orioles management would not sign a long-term lease at the present Baltimore Memorial Stadium facility, but would enter into such a lease at a new stadium at Camden Yards. *Id.* Further on, it was said that the NFL had indicated the importance of stadium quality as a major factor in awarding a franchise and that Baltimore's chances would be lessened absent a new stadium. *Id.* The Report extensively reviewed the various stadium sites under consideration, commenting upon the advantages of the Camden Yards site and that this situs was preferred by the Orioles in order to strengthen the team's attractiveness to the fans, including those from Washington, D.C. The Report favorably commented upon the cost and other matters associated with the Camden Yards site in differentiation from other proposed sites. It also reviewed the financing mechanism, noting in particular that the "lease-backed" financing scheme over the 30–year life of the Authority's bonds required that the

---

**18.** The inclusion of the Cade, Lapides, and Ratchford affidavits in the record was not challenged. As evidence of legislative intent, the Cade and Lapides affidavits run afoul of well-recognized principles. *See* Sutherland, *supra,* at 48.16 and 48.17. The Ratchford affidavit does not purport to pass upon the Legislature's intention in enacting the stadium bills; rather, it recounts the affiant's view of the historical facts associated with the progress of the bills through the General Assembly.

Orioles enter into a long-term lease at the new facility and that sale of the bonds was contingent on such a lease.

The Senate Budget and Taxation Committee "Floor Report" similarly recited some of the same considerations. In particular, it pointed out that "no baseball stadium would be constructed until a long-term lease is signed and no football stadium be constructed until an NFL franchise is awarded." The committee report geared the financing mechanism in ch. 124 to the costs of site acquisition and stadium construction at Camden Yards. And it related that no bond sale would be closed until the Board of Public Works certified that the contemplated long-term Oriole lease at Camden Yards had been obtained and that an NFL franchise had been secured. The committee report stressed the importance and timing of the sports lotteries as a central fact involved in the stadium financing.

We have held time and again that statutes dealing with the same subject matter, particularly when enacted at the same session, being *in pari materia,* must be read together in order to determine their proper construction. *Bridges v. Nicely,* 304 Md. 1, 497 A.2d 142 (1985); *Howard Co. Ass'n, Retard. Cit. v. Walls,* 288 Md. 526, 418 A.2d 1210 (1980); *Police Comm'r v. Dowling,* 281 Md. 412, 379 A.2d 1007 (1977). In interpreting Art. XVI, § 2 of the Constitution, the same principles govern what comprises an appropriation "law." The provision in Art. XVI under which "[n]o law making any appropriation for maintaining the State Government ... shall be subject to" referendum has as its *constitutional* purpose protecting from referendum the purpose or object of the *legislative* appropriation.

Consequently, we must determine whether the dominant statutory objective, as set forth in § 13–701 *et seq.* of the Financial Institutions Article, as amended by ch. 124 can be implemented if ch. 122 is treated as a separate "law" under Art. XVI. To be taken into account within this framework is the fact that the Legislature chose to enact three separate bills rather than one, as it lawfully could have done. *Fishkind Realty v. Sampson,* 306 Md. 269, 280–83, 508

A.2d 478 (1986); *O.C. Taxpayers v. Ocean City*, 280 Md. 585, 597, 375 A.2d 541 (1977); *Equitable Life v. State Comm'n*, 290 Md. 333, 343, 430 A.2d 60 (1981). *See also Andrews v. Governor of Maryland*, 294 Md. 285, 449 A.2d 1144 (1982). Also to be considered in this regard is that the Legislature could have, but did not, make the validity of ch. 124 expressly dependent on the passage of either ch. 122 or 123, as it did with chs. 122 and 123.

Given the form, the substance, the legislative history, and the *in pari materia* status of the stadium bills, we think the Legislature intended that they would function in tandem as a unitary solution to its singular objective—an objective which it timed for immediate implementation, namely, the selection of the Camden Yards site for the sports stadia (ch. 122); site acquisition by the Authority through condemnation proceedings (ch. 123); and funding for the project over a 30–year period to accomplish the end result of stadium construction (ch. 124). The designation of Camden Yards (ch. 122) was the essential building block upon which the remainder of the legislative edifice was predicated to rest. The site having been designated and available for prompt acquisition through quick-take and other condemnation proceedings, the financing provisions of ch. 124 contemplated that the revenue producing sports lotteries (not more than four each year) would be forthwith conducted; [19] that the Authority's bonds would be marketed, beginning in January of 1988, with the proceeds deposited in the Authority's Financing Fund and expended to acquire the Camden Yards properties; and that the State would thereafter lease these properties, whether then useful or not, thereby providing the revenue source for the contemplated annual State appropriation in the Budget Bill to the Authority for payment of the debt service on the Authority's bonds. The stadium bills, thus packaged together for implementation as a single entity, their various parts being mutually dependent upon one another, were manifestly designed to permit prompt

---

19. The first sports lottery was initiated in August of 1987.

negotiation with the Orioles for a long-term lease prior to the scheduled January, 1988 bond issuance date, and for the acquisition of an NFL football franchise.

Considered apart, the stadium bills would not be workable to achieve the objective of the appropriation. To sever ch. 122 from ch. 124 to await the outcome of the November, 1988 General Election would not just thwart the legislative design but, contrary to appellees' contention, would scuttle the entire project by fatally undermining its dominant purpose—to finance the acquisition of a site upon which to construct sports stadiums. As this legislative purpose constitutes, in effect, a single, inseparable "law" making an appropriation for maintaining the State government, none of the individual parts of the package is referable under Art. XVI to a vote of the people.[20] Our conclusion is supported by *County Road Ass'n v. Bd. of State Canvassers,* 407 Mich. 101, 282 N.W.2d 774 (1979), a case involving, as here, several functionally interdependent and associated bills comprising one comprehensive legislative scheme, where the court held under Michigan's constitution that no part of the package was subject to a referendum vote. Other cases have applied a similar rationale in a constitutional referendum context. *See Board of County Commissioners v. Riley,* 391 Mich. 666, 218 N.W.2d 144 (1974); *Michigan Good Roads Federation v. Alger,* 333 Mich. 352, 53 N.W.2d 481 (1952); *Gravning v. Zellmer,* 291 N.W.2d 751, 756 (S.D.1980); *State v. Meyers,* 58 Wash.2d 320, 363 P.2d 121 (1961). *See also State v. Dallmeyer,* 295 Mo. 638, 245 S.W. 1066 (1922).

### V.

██ Lastly, the appellees draw attention to Judge Thieme's conclusion that the Maryland Stadium Authority is

---

**20.** That the Legislature used three rather than one bill to accomplish its singular purpose, and made ch. 123 contingent upon the enactment of ch. 122, but not otherwise, is by no means a controlling consideration. The latter contingency may well be explained on the theory that absent approval of the Camden Yards site the Legislature did not intend to give the Authority carte blanche condemnation powers.

a "public institution" under Art. XVI and consequently any appropriation for maintaining or aiding such an institution in excess of the "next previous appropriation" was subject to referendum. We disagree with this view. Merely because the Authority is designated by statute as a "public corporation" in addition to a State instrumentality does not make it a "public institution" under Art. XVI.

The language of the Referendum Amendment, "not exceeding the next previous appropriation for the same purpose" refers to laws for maintaining or aiding any public institution, but not to laws making any appropriation for maintaining the State government. In his 1927 opinion, Attorney General Robinson recognized this distinction. He said that the "public institution" exception in Art. XVI related only to "educational and eleemosynary institutions, sometimes designated as State-aided institutions." 12 Op. Att'y Gen., *supra*, at 237. In so reasoning, he said:

"The framers intended that the people should have a check upon the amount of money expended by the legislature for the maintenance or aid of public institutions, not owned or controlled by the State. Such institutions do not necessarily perform governmental functions and are largely supported by private capital. Moreover, they are not State controlled, although the State is sometimes given a voice in their management. It is, therefore, not improper, when providing a check upon legislative power, to reserve to the people the right to control any extensions or increases of State aid to such institutions. The reference of such increases could not impair the State government in the exercise of its normal functions, whereas appropriations for the executive, legislative and judicial branches of the Government must be provided, in accordance with the financial needs of these departments, without hindrance or delay." *Id.* at 238.

That this is now the law of Maryland is beyond all question. *Dorsey v. Petrott, supra,* 178 Md. at 235, 13 A.2d 630; *Bickel v. Nice, supra,* 137 Md. at 10; *Winebrenner v.*

*Salmon, supra,* 155 Md. at 567, 571, 142 A. 723; 32 Op. Att'y Gen. 137 (1947).

We conclude, therefore, that the lower court was wrong in determining that chs. 122 and 124 were laws within Art. XVI § 1(a) which were subject to suspension pending vote of the people at the November 1988 general election.

JUDGMENT GRANTING WRIT OF MANDAMUS REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR ENTRY OF SUMMARY JUDGMENT FOR THE APPELLANTS, SECRETARY OF STATE AND GREATER BALTIMORE COMMITTEE; COSTS TO BE PAID BY APPELLEES; MANDATE TO ISSUE FORTHWITH.

ADKINS, Judge.

I agree that Chs. 122, 123, and 124, Acts of 1987, are all part of a package. For purposes of this case, Chs. 122 and 124 (the only parts of the package now before us) should be treated, in effect, as a single act, a conclusion I reach as a matter of statutory construction. I also agree that our cases support the holding that Ch. 124 makes an "appropriation" within the meaning of art. XVI, § 2 of the Constitution. But I do not agree that this appropriation is for the purpose of "maintaining the State Government." And even if it does meet that definition, I believe that reference is required for either one of two reasons. First, I believe that Chs. 122 and 124 are referable because the dominant purpose of the package is to establish public policy, not to appropriate funds. Second, I believe that Ch. 122 alone is referable under art. XVI, § 1(a), permitting reference of "any Act, or part of any Act of the General Assembly."

I.

The starting point for discussion is the nature of that "power known as The Referendum" that the "people reserve[d] to themselves" when they ratified art. XVI of the Constitution in 1915. Scholars trace the origin and development of the referendum to classical Greece, the Roman

plebiscite, certain customs of the ancient Saxons, the philosophy of Jean Jacques Rousseau, and, most especially, Switzerland. *See, generally,* D. Butler and A. Ranney, *Referendums* (1978); C. Lobinger, *The People's Law* (1909); E. Oberholtzer, *The Referendum in America* (2d ed. 1912). An oft-mentioned American example of direct legislation (of which the referendum is a species) is the New England town meeting. But in this country direct legislation was not extensively used at the level of state government until Progressive and Populist pressures caused its rather widespread introduction in the period extending from the late 1890's until our entry into World War I. It was during this era, of course, that the referendum came to Maryland, as it came to 20 other states. *Referendums* at 70. In one form or another, provisions for direct legislation now exist in many states and the District of Columbia. *Id.* at 71–72.

The referendum has its critics; we noted some of its purported drawbacks in *Tyler v. Secretary of State,* 229 Md. 397, 402, 184 A.2d 101, 104–105 (1962). Strong proponents of representative government do not like the concept of direct legislation, sometimes even questioning whether it is consistent with that "Republican Form of Government" which "[t]he United States shall guarantee to every State in this Union ..." by virtue of art. IV, § 4 of the United States Constitution. *See, e.g., The Referendum in America* at 471–513.[1] Were I to vote on the question today, I

---

1. In addition to Dr. Oberholtzer's treatise, anti-referendum arguments are presented in, for example, C. Everstine, *The General Assembly of Maryland, 1850–1920,* at 570 (1984); McCall, "Representative as Against Direct Legislation," *The Initiative Referendum and Recall* 164–193 (W. Munro, ed. 1913) [hereinafter the book is cited as Munro]; Bell, *The Referendum: Democracy's Barrier to Racial Equality,* 54 Wash.L.Rev. 1 (1978); Comment, *Judicial Review of Laws Enacted by Popular Vote,* 55 Wash.L.Rev. 175 (1979). Typical views of direct legislation proponents are found in L. Tallian, *Direct Democracy* (1977); Bourne, "A Defense of Direct Legislation" in Munro at 194; and Comment, *Initiative & Referendum—Do They Encourage or Impair Better State Government?* 5 Fla.St.U.L.Rev. 925 (1977). Both positions are summarized in *Referendums* at 24–37. *And see* Constitu-

might oppose adoption of a referendum provision such as art. XVI. But the issue now before us is not whether representative government, undiluted by a referendum provision, is the wiser policy. It is the meaning and scope of art. XVI as adopted by the voters of Maryland some 72 years ago. We must construe art. XVI in light of the goals or objectives the people sought to achieve when they adopted it. *See Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628, 632 (1987). We should examine the constitutional language "in the light of its origin, the purpose it was intended to serve, as well as the evils it was intended or supposed to remedy." *Beall v. State,* 131 Md. 669, 676, 103 A. 99, 102 (1917).

There does not seem to be much available legislative history to inform us about art. XVI. *Beall* was the first case in which our predecessors considered its provisions, and there the Court observed that the referendum was designed to remedy "the control by corrupt methods of legislation and administration by great corporations and a group of individuals in each state who had taken into their hands the machinery of each of the great political parties." *Beall,* 131 Md. at 677, 103 A. at 102. *See also Ritchmount Partnership v. Board,* 283 Md. 48, 60–61 nn. 8 & 9, 388 A.2d 523, 530 nn. 8 & 9 (1978). Since, however, Maryland's adoption of the referendum occurred during the Progressive era, we may assume that the same hopes that animated the leaders of the movement elsewhere inspired the Maryland citizens who voted for art. XVI.

Woodrow Wilson argued that adoption of direct legislation would force legislatures to "represent the sovereign people whom they profess to serve...." Wilson, "The Issues of Reform," Munro, *supra,* 69 at 88. Theodore Roosevelt asserted that "on any bill important enough to arouse genuine public interest there should be power for the people to insist on the bill being referred to popular

---

tional Convention Commission of Md., *Constitution Revision Study Documents,* 73–77 (1968).

vote, so that the constituents may authoritatively determine whether or not their representatives have misrepresented them." Roosevelt, "Nationalism and Popular Rule," Munro, *supra*, 52 at 57. Robert Treat Paine declared that the referendum "becomes ... a true people's veto" and "[t]he people thus become directly sovereign in regard to the acts of their own agents or representatives." Paine, "The Development of Direct Legislation in America," Munro, *supra*, 92 at 93. Jonathan Bourne thought that the people "are the best judges of their own self-interest and have a right as sovereign citizens to determine the policies of their government." Bourne, "A Defense of Direct Legislation," Munro, *supra*, 194 at 199. More contemporary writers have described the purpose of the referendum movement as to "increase ordinary citizens' participation in and power over governmental decisions." *Referendums* at 27.

The short of it is that art. XVI expressly granted to the people of Maryland the power to invoke a procedure whereby they could make their own decisions as to important matters of public policy. *Beall,* 131 Md. at 678, 103 A. at 102. As another court has put it, by adopting the referendum, "the legislature and the people intended to reserve to themselves the right to pass upon ... such laws as define substantive rights, or which affect public measures and policies." *State v. Clausen,* 85 Wash. 260, 272–273, 148 P. 28, 32 (1915). Such a constitutional provision, therefore, should be liberally construed to effect these purposes. *See Margolis v. District Court,* 638 P.2d 297, 302 (Colo.1981); *Kuhn v. Dept. of Treasury,* 384 Mich. 378, 385 n. 10, 183 N.W.2d 796, 799–800 n. 10 (1971); *Baker v. Jackson,* 372 N.W.2d 142, 145 (S.D.1985).

To be sure, the right of referendum is not unlimited. Art. XVI itself sets forth certain exceptions to the general principle of referability. One of these, as we have seen, is the limitation that "[n]o law making any appropriation for maintaining the State Government" is subject to referendum. Art. XVI, § 2. It is clear that this exception was intended "to provide against the possibility of the govern-

ment being embarrassed in the performance of its various functions." *Winebrenner v. Salmon,* 155 Md. 563, 568, 142 A. 723, 725 (1928). But the embarrassment the framers intended to prevent is only that which would occur if, by referendum petition, an "appropriation for maintaining the State Government" were to be suspended pending a vote on the matter. In approaching the question of what is meant by an "appropriation for maintaining the State Government" we should read the exception narrowly in light of the importance of effectuating the right of referendum. *Lawrence v. Beermann,* 192 Neb. 507, 508–509, 222 N.W.2d 809, 810 (1974). The majority, in my view, reverses the process by giving a broad reading to the exception and a grudging one to the referendum provision as a whole.

As I have said, I do not quarrel with the holding that Ch. 124 makes an appropriation. But I do not believe it is one for "maintaining the State Government" in the art. XVI sense. The majority, reaching the contrary conclusion, reasons that the provision of parks, sports facilities, stadiums, and the like for public recreational facilities is a valid public purpose. Slip op. at 461, 465. Again, I have no quarrel with this statement. But the next step in the analysis is to decide that an appropriation for some valid public purpose is of necessity one for "maintaining the State Government." Slip op. at 465–468. It is at this point that I part company with my colleagues, for I believe that they have parted company with our decisional law.

In *Winebrenner* the Court had before it an act imposing a gasoline tax and disposing of its proceeds "for the construction of lateral roads...." 155 Md. at 565, 142 A. at 724. Faced with an art. XVI challenge to this measure, the Court had to decide, among other things, whether the act contained an appropriation for "maintaining the State Government." After suggesting a distinction between the referability of an appropriation for some brand new governmental function (which highway construction obviously was not) and referability of appropriation for an established function, the Court looked to the nature of the function

involved. It concluded that "the establishment, construction and maintenance of public roads is a *primary function* of government." *Id.*, 155 Md. at 568, 142 A. at 725 (quoting *Bonsal v. Yellott*, 100 Md. 481, 500, 60 A. 593, 594 (1905)) [emphasis supplied]. Thus, our predecessors read the exception now before us as requiring, in effect, an appropriation "for maintaining a primary function of the State Government." A bill making such an appropriation, they held, is not subject to referendum.

The same note was sounded in *Bickel v. Nice*, 173 Md. 1, 192 A. 777 (1937). There the legislation sought to be referred was an appropriation for construction of an office building for state employees. The Court held that the act was not subject to referendum, explaining that "[h]ousing for state officers and employees would seem to be as much a *primary function* of government as building lateral roads, and equally entitled to be classed as maintaining the government" [emphasis supplied]. *Id.*, 173 Md. at 10, 192 A. at 781. And in *Dorsey v. Petrott*, 178 Md. 230, 13 A.2d 630 (1940), where the principal issue was whether an act effected an appropriation, we thought it undoubted that "the conservation of the fisheries of tidewater Maryland ... is ... a function of government." *Id.*, 178 Md. at 235, 13 A.2d at 633. That was because "[t]hese fisheries constitute one of the most important and valuable natural resources of the State, and their protection, preservation, development and maintenance are an *imperative duty of Government.*" *Id.* [emphasis supplied].

Finally, in *Bayne v. Secretary of State*, 283 Md. 560, 392 A.2d 67 (1978), we dealt with a measure involving the public funding of abortions. That, too, was not subject to referendum. We characterized the legislation as involving the provision of medical services for indigent persons and said that "the preservation of health of the inhabitants is one of the *chief purposes* of government." *Id.*, 283 Md. at 570, 392 A.2d at 72 [emphasis supplied]. We added that "the relief of indigent persons is a function of government," and concluded "that the provision of medical services for indi-

gent persons is a *primary function* of government." *Id.*, 283 Md. at 571, 392 A.2d at 73 [emphasis supplied].

These decisions, it seems to me, lay down two rules about the meaning of an appropriation "for maintaining the State Government." The first is that if the appropriation is designed to support some completely new function, never before undertaken by government, and not yet in being, it is subject to referendum. The rationale underlying the rule is that one cannot "maintain" that which does not yet exist. This seems to be one of the teachings of *Winebrenner*, but it does not apply to this case. While the Camden Yards sports complex is not yet *in esse*, State fiscal support of a stadium is nothing novel.

The second rule, which does apply here, is that even as to an existing governmental activity, an appropriation bill does not fall within the constitutional exception unless it relates to a *primary* function of government; that is, one as to which the government has an *imperative duty* to maintain. While the majority scoffs at the notion that we intended "to elevate any of those adjectival terms to the status of a governing test," slip op. at 466–467, I disagree. Perhaps I am naive; nevertheless, I believe that words in judicial opinions are not mere rhetorical flourishes, but rather carefully considered verbal devices artfully designed to express specific ideas. I cannot accept the notion that our predecessors used language so loosely in four important cases.[2]

---

**2.** *Winebrenner* is the first case to employ one of these "adjectival terms"; the subsequent cases that use them all follow from *Winebrenner*. It is of particular interest, then, that the *Winebrenner* Court in 1928 did not adopt the conclusion of Attorney General Robinson's 1927 opinion to the effect that "the broad language of the [appropriation] exception was intended to include all laws providing revenue for and/or appropriating monies to any organized department of the State ... [for the] exercise of State functions." 12 Op. Att'y Gen. 228, 236 (1927). This reading of the exception is much like that adopted by the majority today. Notably, the Attorney General did not use any adjective to modify "State functions." Notably, the *Winebrenner* Court did, as did the Court in *Bickel, Dorsey,* and *Bayne.* It is not unreasonable to infer that the difference in language arose from a

Moreover, if one accepts that words such as "primary," "imperative," and "chief" were intended to have the meanings usually attributed to them, the "appropriation" exception becomes quite consistent with the fundamental purpose of the referendum. If the appropriation is indeed made for a primary, or imperative, or essential, and ongoing function of government, then the act cannot be referred. That would, indeed, "embarrass" government and be detrimental to the public. Should such a measure be suspended, thereby bringing to a halt a critical governmental operation? But that grave problem does not arise if the appropriation is for some lesser function, one that is not essential, but merely legally permissible for government to perform. In the latter instance, the people's right to decide policy issues for themselves (the core purpose of the referendum) should prevail.[3]

Although not in the context of a referendum, the Supreme Judicial Court of Massachusetts has well explained the difference between primary or essential government functions and lesser ones:

We are of opinion that a large multi-purpose stadium or an arena for public activities and events, conventions, professional and amateur athletic events, and other large gatherings may be for a public purpose if the expenditure

---

different view about the interpretation of the appropriations exception, and a judicious selection of words to express that different view.

3. The majority's view also seems to be that once the legislature has determined "need" for a project, an appropriation for that project is not subject to referendum if the project is for some proper governmental purpose. Slip op. at 468. Were that the case, the referendum provision would be a virtual dead letter. An act proposing any project whatsoever within the broad realm of proper governmental purpose would be referendum-proof if it included a revenue raising measure. But I do not read the cases to permit such a facile frustration of the constitutional right. The "need" discussion was first developed in *Bickel,* and what is said there is that if the appropriation involves a *primary function* of government, we will not second guess the legislature as to how the function is to be performed. 173 Md. at 10–11, 192 A. at 781–782. It is only in that sense that "need" is the sole prerogative of the legislature.

of public funds, the extension of public privileges, powers, and exemptions, and the use, rental, and operation of the projects are adequately governed by appropriate standards and principles set out in the legislation. The Legislature may reasonably determine that there are economic, civic, and social advantages to Boston, to eastern Massachusetts, and to the Commonwealth as a whole, from providing in the largest city in the State a stadium and an arena large enough to attract conventions and similar gatherings and to provide for audiences sufficient to support enterprises of interest to large numbers of people, and suitable to provide recreation and instruction to citizens and others....

The provision of such facilities, however, is not as clearly and directly a public purpose as supplying housing, slum clearance, mass transportation, highways and vehicular tunnels, educational facilities and other necessities. As to such essential enterprises, the public objectives are well understood. The appropriate and usual methods of achieving them also, on the whole, are well established. In such cases, somewhat general standards of public convenience and necessity and principles of prudent, frugal government administration, necessarily to be implied from the essential projects themselves, may adequately guide the expenditure of public funds, even where there may be involved arrangements with private persons or entities operating for profit....

*Opinion of the Justices,* 356 Mass. 775, 795, 250 N.E.2d 547, 558 (1969) [citations omitted].

Returning to the particular matter before us, I reiterate my agreement that public parks, museums, art galleries, sports facilities and the like are all proper objects of governmental support. It might even be argued that in our urbanized society some, especially those such as parks which are not likely to be provided by the private sector, are primary or necessary functions. But that cannot be said of football and baseball stadiums, designed not only for public

recreation but also for substantial private profit. No doubt these stadiums will bring money to Baltimore City and to the State. No doubt they will provide amusement for football and baseball fans, and employment for athletes and others who provide related services. But government will not come to a halt if the stadiums are not built, and no primary or essential function of government will be one whit affected if the people are allowed to vote on the stadiums package in 1988. A suggestion that the General Assembly itself recognized this fact is seen in the legislative emphasis on the desirability of private funding for the sports complex. *See* the preamble to Ch. 124. Moreover, whether to have these stadiums and where to place them and how they are to be funded are important policy questions of precisely the sort that should be subject to referendum. A proper reading of art. XVI, § 2 should permit the referendum appellees seek.

## II

Even if Ch. 124 makes an "appropriation for the maintenance of the State Government," and even if we consider the stadiums package as a single bill, I believe the package is subject to referendum. This is so because Chs. 122 and 124, taken together, do not constitute an appropriation bill. "[A]n act of the General Assembly which relates primarily and specifically to a subject matter of general legislation cannot be converted into an appropriation bill merely because there may be an incidental provision for the appropriation of public funds." *Dorsey,* 178 Md. at 251, 13 A.2d at 640. There, Judge Parke, writing for the Court, illustrated the point by quoting *Bengzon v. Secretary of Justice and Insular Auditor of the Philippine Islands,* 299 U.S. 410, 413, 57 S.Ct. 252, 254, 81 L.Ed. 312, 314 (1937):

The term "appropriation act" obviously would not include an act of general legislation; and a bill proposing such an act is not converted into an appropriation bill simply

because it has had engrafted upon it a section making an appropriation. An appropriation bill is one the primary and specific aim of which is to make appropriation of money from the public treasury.

In *Dorsey*, legislation substantially changing "the policy of the State with reference to the mode in which the natural resources of the State are to be conserved", 178 Md. at 249, 13 A.2d at 640, was not an appropriation even though it contained provisions for salaries, for fines, and for certain fees (the last two of which would become part of the State's funds). This law, the Court said, was manifestly "a general law, and not an appropriation measure," 178 Md. at 247, 13 A.2d at 639, because its primary and specific aim was not to make appropriations from the public treasury. *Id.*, 178 Md. at 251, 13 A.2d at 641. So it is with the legislation before us.

The package consists of Chs. 122, 123 (Ch. 123 was not petitioned to referendum, but nevertheless was part of the package) and 124. As the majority makes clear, the first two of these have nothing to do with appropriations in any sense whatsoever. Slip op. at 439–442. Even the third is not an appropriation bill in the usual sense of one that authorizes the disbursement of public funds. It does no more than provide for the raising of revenue and for certain funding mechanisms.

The heart of the package is Ch. 122, aptly characterized by the majority as "the essential building block upon which the remainder of the legislative edifice was predicated to rest." Slip op. at 472. This Act is the *sine qua non* of the package; it identifies Camden Yards as the site of the sports complex. Ch. 123 augments it by granting condemnation powers to the Stadium Authority. These two measures clearly are what the *Dorsey* Court describes as "general law" and they show that the dominant theme of the package, as in *Dorsey*, is "general law" and not "appropriation." Under *Dorsey's* reasoning the package (or Chs. 122

and 124—the portions of it as to which petitions were filed) is subject to referendum.

## III.

There is a third reason why Ch. 122, at least, is referable, even if Ch. 124 is "an appropriation for the maintenance of the State Government" and if we consider the stadiums package as a single bill. The art. XVI process is available because the power of referendum includes the power "to approve or reject at the polls, any Act, *or part of any Act* of the General Assembly...." Art. XVI, § 1(a) [emphasis supplied].

I recognize that in *Bayne* we said that "[a] part of an excepted law ordinarily is not referable." 283 Md. at 576, 392 A.2d at 75. In that case the Court concluded that conditions attached to a budget bill appropriation for public health purposes did not constitute improper legislating in the budget. The conditions were "an integral part of the appropriation" and did not "reflect [an] attempt to establish policy by general legislation." 283 Md. at 574, 392 A.2d at 74. This language correctly applies the reasoning in *Berlin v. Shockley*, 174 Md. 442, 199 A. 500 (1938). The holding in *Berlin* was that certain legislation could not be referred because it dealt with "licensing, regulating, prohibiting, or submitting to local option the manufacture or sale of malt or spirituous liquors...." *Id.*, 174 Md. at 444, 199 A. at 500. Laws of this sort are barred from referendum by art. XVI, § 6. To reach that result, the *Berlin* Court concluded that the dominant purpose of the legislation before it was the regulation of the sale of liquor, just as the *Bayne* Court found that the dominant purpose of the legislation before it was an appropriation for the maintenance of State government. But *Berlin* goes on to explain that "[a]n association in a single enactment of a referable law and one of the kinds excepted from the referendum, if that would be feasible without violation of the constitutional prohibition in article 3, section 9, against including more than one subject, might, perhaps, be found to leave part of an enactment

referable, but not part of the excepted law." 174 Md. at 446, 199 A. at 501.

What this means is that if an act contains both an appropriation for the maintenance of State government and substantive policy determinations, the latter, at least, may be referred. If the policy material is dominant, then the reference would be under the *Dorsey* principle discussed above in Part II. If the appropriation material is dominant, there would be no reference under *Bayne* and *Berlin*. If neither is dominant, then art. XVI can be invoked as to the policy or general law material, if not as to the strictly appropriation material. This occurs by virtue of the "part of any Act" portion of art. XVI, § 1(a), as construed early on in *Winebrenner*, although partial reference was not available there because, as Judge Adkins noted, "[the] petition for referendum was on the entire act" and not on any part of it. 155 Md. at 571, 142 A. at 726. *Winebrenner's* analysis was based on *State v. Clausen*, 85 Wash. 260, 148 P. 28 (1915). In that case the Supreme Court of Washington held that "[i]t was clearly the intention of the people to except [from referendum] all ordinary appropriation bills." *Id.*, 85 Wash. at 272, 148 P. at 32. This was because

> [a]n appropriation bill is not a law, in its ordinary sense. It is not a rule of action.... It defines no rights and punishes no wrongs.

*Id.* But

> [i]f the people desire a referendum upon any part of the bill referred to as the fisheries code, they have reserved that right in subdivision "b" of section 1, art. 2 of the amendment. They say that a referendum may be ordered on any act, bill, law or any part thereof passed by the legislature. If the people desire to pass upon the character of appliances for taking fish or any other feature of the law, they may do so, but it does not follow that an appropriation made by the legislature ... must fail while

some particular item in a general code is subject to the referendum.

*Id.*

In other words, although an appropriation may not be subject to referendum, the other parts of the act are. If the legislature chooses to pass laws which combine appropriations with general, substantive legislation, with neither subject being dominant, thus making it impossible to characterize them as being wholly appropriations or wholly not, the non-appropriations portions are referable. This gives meaning to the "part of any Act" language in art. XVI and is consistent with the notion of liberal construction of the referendum amendment to effectuate its goals.

In the case before us, even if Ch. 124 is an excepted appropriation, Ch. 122 clearly is not. If Ch. 122 is not the dominant part of the package (although as I have stated above, it actually would seem to be), neither is Ch. 124. Ch. 124 may not be subject to referendum, but Ch. 122 is. It is "any part" of the package we are treating as a single act and makes no appropriation for maintaining State government.[4]

For the reasons stated, I would affirm the judgment of the Circuit Court for Anne Arundel County, or at least that portion of the judgment submitting Ch. 122 to referendum.

---

**4.** The authorities cited by the majority to support its view that no part of the package is referable, slip op. at 473–474, are unpersuasive. No Maryland case is mentioned. The Michigan and South Dakota cases are not on point because the referendum provisions in those states, unlike that of Maryland, do not permit referral of part of an act. Washington, as we have seen, does, but *State v. Myers,* 58 Wash.2d 320, 363 P.2d 121 (1961), in no way lessens the authority of *Clausen.* In *Myers* no contention was based on the partial reference language of Washington's constitution. Rather, the argument was that the act, part of which was sought to be referred, simply was not a law "necessary for the immediate preservation of the public peace, health, or safety [or] support of the State government and its existing public institutions." 58 Wash.2d at 326, 363 P.2d at 125. The Court held that the legislative finding, that the act was of this character, should be accepted, thereby precluding a referendum. 58 Wash.2d at 330–331, 363 P.2d at 127. Similarly, in *State v. Dallmeyer,* 295 Mo. 638, 245 S.W. 1066 (1922), there is no discussion of constitutional permission for partial reference.